GEORGE MCGINLEY ET AL., APPELLEES, V. UNION PACIFIC
RAILROAD COMPANY ET AL., APPELLANTS.

FILED NOVEMBER 15, 1935.   No. 29365.

*T. F. Hamer, George C. Holdrege, T. W. Bockes, James T.
Keefe* and *Crofoot, Fraser, Connolly & Stryker*, for appellants.

*Halligan, Beatty, Halligan & Maupin, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

EBERLY, J.

This is an action by plaintiffs, George McGinley & Sons, copartners, against the Union Pacific Railroad Company and the Chicago, Milwaukee, St. Paul & Pacific Railroad Company, for damages occasioned by unnecessary delay, due to the negligence of the defendants, who are connecting carriers, in the transportation of 98 head of fat cattle from Brule, Nebraska, to the Union Stock Yards at Chicago, Illinois. These defendants will hereinafter be referred to as the "Union Pacific" and the "Milwaukee," respectively.

A trial to a jury, after issues were joined, resulted in a verdict for plaintiffs, returned and filed February 9, 1934. Separate motions for new trial were thereupon filed by the defendants on February 10, 1934. On April 2, 1934, proceedings were had upon motion of plaintiffs to tax attorneys' fees. Further evidence limited to this subject was introduced, defendants participating in the hearing. On April 3, 1934, "that still being one of the days of the regular February A. D. 1934 term of this court," the motions for new trial theretofore filed, together with the application for allowance of attorneys' fees on behalf of plaintiffs, were submitted and taken under advisement by the court. On May 19, 1934, "that being one of the days of the regular April A. D. 1934 term of the court, this matter having heretofore been taken under advisement by the court upon the motions for new trial and an application for attorneys' fees on behalf of the plaintiffs filed herein," the motions for new trial were each overruled; judgment was entered on the verdict; and it was further ordered that plaintiffs' attorneys be allowed a fee of $250 to be taxed as part of the costs. From the judgment rendered, the defendants Union Pacific and Milwaukee prosecute this appeal.

The first proposition presented by appellant Milwaukee is a challenge to the jurisdiction of the trial court over its person.

The transcript discloses that plaintiffs' petition was filed in Keith county, Nebraska; that summons was duly issued thereon, and proper service thereof was made on the Union Pacific in Keith county, Nebraska; that there was also a summons issued in said cause to the sheriff of Douglas county, Nebraska; that, without any challenge to the jurisdiction of the court, the Milwaukee thereupon appeared and by motion attacked plaintiffs' petition, which motion was duly sustained on November 23, 1933; that plaintiffs thereupon amended their petition to conform to the ruling of the trial court then made; that on January 31, 1934, the Milwaukee filed its amended answer to plaintiffs' amended petition, which in no manner challenged the jurisdiction of the district court for Keith county. On February 7, 1934, a trial in this action was commenced in the district court for Keith county. The defendant Milwaukee appeared by its attorneys and participated therein. At the close of plaintiffs' evidence the Milwaukee demurred to plaintiffs' evidence, and moved for judgment in its behalf. This motion was denied by the trial court. Evidence was thereupon adduced in its behalf. At the close of all the evidence, the Milwaukee again moved for judgment on the insufficiency of plaintiffs' evidence, to which was coupled as an additional ground, and for the first time during the course of the trial, a challenge to the jurisdiction of the trial court over its person.

Under the facts enumerated, the controlling rule is: "A general appearance in a cause vests the court with complete jurisdiction of the person of the defendant so appearing." *Independent Elevators v. Davis*, 116 Neb. 397. See, also, *Troyer Furniture Co. v. Orchard & Wilhelm Co.*, 121 Neb. 301; *Nebraska State Bank v. Citizens State Bank*, 122 Neb. 522; *Gaines v. Warrick*, 113 Neb. 235; *Adams v. Guthrie & Co.*, 113 Neb. 192; *Bodge v. Skinner Packing Co.*, 115 Neb. 41.

It follows that the Milwaukee's challenge to the jurisdiction of the court, at the time when first made, was properly disposed of by the trial court.

As heretofore outlined herein, the record does not present for our decision the question as to the claimed improper allowances of attorneys' fees by the trial court.

As we have noted, defendants' motions for new trial were both filed prior to the determination and allowance of attorneys' fees by the trial court, "as part of the costs." *Marsh & Marsh v. Chicago & N. W. R. Co.*, 103 Neb. 654; *Missouri, K. & T. R. Co. v. Cade*, 233 U. S. 642. So far as disclosed by the transcript, no motion to retax costs was ever filed in the district court nor a ruling of that tribunal had on such a motion. "In order to review the question of taxation of costs, a motion to retax the costs must be made in the trial court, and a ruling obtained thereon by that court." *Real v. Honey*, 39 Neb. 516. See, also, *Yankton, N. & S. W. R. Co. v. State*, 49 Neb. 272; *Cozine v. Hatch*, 17 Neb. 694; *Whitall v. Cressman*, 18 Neb. 508; *Wilkinson v. Carter*, 22 Neb. 186.

It may be said in passing that under section 74-715, Comp. St. 1929, the plaintiffs, under the facts established by the evidence, appear to have been entitled to an allowance of attorneys' fees as an element of the costs of suit recoverable in this case in the district court. *Marsh & Marsh v. Chicago & N. W. R. Co.*, 103 Neb. 654; *Nye-Schneider-Fowler Co. v. Chicago & N. W. R. Co.*, 105 Neb. 151, and see same case in 260 U. S. 35; *Mayhall & Neible v. Chicago, B. & Q. R. Co.*, 107 Neb. 58; *Wagner v. Union Stock Yards Co.*, 107 Neb. 769; *Schneider v. Davis*, 109 Neb. 638; *Daily v. Chicago, St. P., M. & O. R. Co.*, 110 Neb. 481. But, as the matter is not properly presented by the record, no determination of that question is announced.

This is not a trial *de novo* in this court. It is an appeal in a law case. Such being the fact, disputed questions of evidence relating to facts must be considered in the light of the verdict returned. The conclusions of the jury as to the weight of the evidence and the facts in controversy, so far as sustained by competent proof, is binding on this court.

The 98 head of cattle were received by the Union Pacific at Brule, Nebraska, consigned to Charles O. Robinson &

Company of Chicago, Illinois, a commission firm engaged in the live stock business at the Union Stock Yards of that city. The cattle, in charge of caretakers, arrived at Valley, Nebraska, where the shipment was unloaded for water, feed and rest. It appears that the plaintiffs, in shipping cattle from Keith county, Nebraska, to Chicago, Illinois, never planned on more than one stop for feed and water. While the shipment was billed from Brule, Nebraska, to Chicago by the Union Pacific, no special route was designated beyond the terminus of that railroad, but the shipment was to stop and feed at Valley, Nebraska. It was contemplated that the route from Valley, Nebraska, to Chicago would be selected at the former place by the shipper after arrival. George McGinley went along with the cattle to make this selection. Eliminating questions of disputed evidence, it appears that there were two practical routes from Valley to Chicago; one over the Chicago & N. W. R. Company, the other over the Milwaukee line. Both were represented by their agents as being able to transport the stock to Chicago in time for the Monday morning market of June 22d. But, to proceed over the Chicago & N. W. R. Company, it was necessary that the cattle be loaded in cars at Valley an hour prior to the time required in the event the shipment proceeded over the Milwaukee line. The Milwaukee's agents were fully advised of the fact that the shipper desired to arrive at Chicago for the Monday morning market, and represented that train No. 82, the one which carried plaintiffs' shipment, had been making that run in 20 to 23 hours from Council Bluffs, Iowa, which would afford ample time for the completion of the movement within the "twenty-eight hour limit." The plaintiffs desired to keep the cattle out of the cars at Valley as long as possible, and, relying on the assurances of the Milwaukee, selected that line for the transportation of the cattle from Council Bluffs to Chicago. The cattle remained in charge of plaintiffs' caretaker, and, in due time, were delivered to the Milwaukee and made a part of its stock train No. 82. When this train arrived at Savanna, Illinois, it was

25 minutes ahead of the scheduled time. Immediately prior to arriving at this place, Ted McGinley, the caretaker in charge of the shipment, had inquired of the conductor in charge of the train as to the time it would take to complete the run to Chicago, and was informed that the average time was 6 or 7 hours. If this information had been correct the run would have been fully completed within the 28 hours, and no extension to 36 hours would have been required. Defendants' evidence is that on arrival of stock trains at Savanna a representative of the Milwaukee conducts the caretakers to a railway eating-house where they are requested to wait until the representative of the Milwaukee again calls for them for their "connections." This program was carried out on the night in question. The evidence of Ted McGinley, the caretaker, is to the effect that he went to the eating-house as requested, remained there as directed, and returned to the newly made-up train accompanied by the railway representative. Further, that at no time was he advised of the necessity of executing a request for an extension of the running time from 28 hours to 36 hours in order that the cattle might arrive in Chicago as planned; and that he knew nothing concerning the removal of the 5 carloads of cattle from train No. 82 at Savanna until after his arrival at the Chicago Stock Yards on the 22d. Notwithstanding the fact that caretaker McGinley was, during the entire stop at Savanna, practically in the personal charge of the representatives of the Milwaukee, the general yardmaster at Savanna, without communicating with said McGinley, removed the 98 head of cattle from the train and caused them to be unloaded at a feed-yard for feed, water and rest. The sole reason of the yardmaster for his action is that no request for an extension of the 28-hour limit to 36 hours had been made, and the Milwaukee has prescribed a rule that, "We have to have ten hours from leaving time at Savanna to make the U. S. Yards." This direction was issued by the general manager's office in Chicago to the general yardmaster at Savanna. It was not issued to the conductors in charge of stock trains, and we may infer from

the evidence that the conductor in charge of train No. 82 knew nothing about it. However, the yardmaster testifies that he endeavored to get in touch with McGinley, the caretaker in charge, but failed. It must be admitted that this failure, so far as disclosed by the evidence, was in no manner due to any fault of McGinley. On behalf of the owners, McGinley, the caretaker, was authorized to execute the usual written request for an extension of shipping time to 36 hours, and admittedly would have done so if given the opportunity. As a result of this action of the Milwaukee and the necessary delay occasioned thereby, the cattle did not arrive for the Monday market, and in fact were not received until Tuesday following. The caretaker in charge was prevented from performing the duties of his office, and the shipment on arrival at the Chicago Stock Yards was in such condition that the cattle could not be sold until on Wednesday's market. It appears that the Tuesday market following, as well as Wednesday's, was concededly lower than the Monday market. It appears the condition of the cattle also was seriously impaired, far beyond that incident to ordinary shipments. That the shipper suffered substantial damages is clearly established, and the questions presented by the record are (1) the liability of the carrier, and (2) the extent of the loss sustained as properly established by the evidence.

As the transportation involved constituted an interstate shipment, federal statutes, so far as applicable, are controlling. Two congressional enactments become important. The first, ordinarily referred to as the "Carmack amendment" (49 U. S. C. A., ch. 1, sec. 20 [11]), so far as here material, is as follows:

"Any common carrier, railroad, * * * receiving property for transportation from a point in one state * * * to a point in another state * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property, caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over

whose line or lines such property may pass within the United States. * * * *Provided further,* That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law."

In interpreting this statute, the supreme court of the United States has given full force and effect to the quoted proviso, announcing its conclusion, as follows, in substance: "The common-law liability of a carrier as an insurer was not changed with respect to a loss occurring on its own line by the provision of the Carmack amendment of June 29, 1906 (34 Stat. at L. 584, chap. 3591), to the act of February 4, 1887 (24 Stat. at L. 379, chap. 104, Comp. Stat. 1913, sec. 8563), section 20, making the initial carrier of an interstate shipment liable for any loss, damage, or injury 'caused by it' or by any other carrier to which the shipment may be delivered." *Cincinnati, N. O. & T. P. R. Co. v. Rankin,* 60 L. Ed. 1022 (241 U. S. 319).

And again, in *Oregon-Washington R. & N. Co. v. McGinn,* 66 L. Ed. 689 (258 U. S. 409) the rule was announced:

"The common-law liability of the initial carrier only is dealt with and modified by the Cummins (Carmack) amendment of March 4, 1915. It renders that carrier liable for loss or damage to the property committed to its care throughout the entire route by which it is billed until delivered to the consignee; but it leaves the relation of all connecting carriers, including the terminal carrier, to the shipper or consignee and to each other, entirely unaffected." See, also, *Hansen-Peterson Co. v. Atchison, T. & S. F. R. Co.,* 165 Minn. 43; *Whitnack Produce Co. v. Chicago & N. W. R. Co.,* 104 Neb. 587; *Starr v. Chicago, B. & Q. R. Co.,* 103 Neb. 645.

It follows that the Carmack amendment did not change any liability of the defendant Milwaukee to the shipper for loss occurring on its own line as connecting carrier. Aside from the liability imposed by the terms of this amendment, the defendant is liable to the owner of freight carried by it, for damages thereto occasioned by its own negligence.

In discussing a similar question, in *Atlantic C. L. R. Co. v. Riverside Mills,* 219 U. S. 186, 206, Mr. Justice Lurton employs the following language:

"The liability of the receiving carrier which results in such a case is that of a principal for the negligence of his own agents. In substance congress has said to such carriers, 'If you receive articles for transportation from a point in one state to a place in another, beyond your own terminal, you must do so under a contract to transport to the place designated. If you are obliged to use the services of independent carriers in the continuance of the transit, you must use them as your own agents and not as agents of the shipper.' It is, therefore, not the case of making one pay the debt of another. The receiving carrier is, as principal, liable not only for its own negligence, but for that of any agency it may use, although, as between themselves, the company actually causing the loss may be primarily liable."

It may be said *arguendo* that, if the effect of this statute is to impose the liability of principal and agents on carriers involved in interstate transportation, the situation in the present case would invoke the application of this rule: "Where an agent and his principal are both liable for the same act of negligence, or the same tort, they may be joined as parties defendant in an action to recover damages for the injuries caused thereby. They may be sued either jointly or severally like other joint tort-feasors." 2 C. J. 903. See, also, *Atlantic C. L. R. Co. v. Riverside Mills,* 219 U. S. 186; *Burkenroad Goldsmith Co. v. Illinois Central R. Co.,* 138 La. 81; *Dietz v. Southern P. R. Co.,* 225 Mo. App. 39; *Makeever v. Georgia S. & F. R. Co.,* 219 Ky. 699; *Nation v. San Antonio S. R. Co.,* 115 Tex. 431; *Burd v. San Antonio S. R. Co.,* 261 S. W. (Tex.) 1021; *Northern P. R. Co. v. Wall,* 241 U. S. 87.

However, the question not being presented by the briefs of the parties, and not being necessary to the determination of the case, it is reserved. But, in the instant case, no objection to misjoinder of parties defendant having been

called to the attention of the district court before trial, the objection may not now be waged. *Mayhall & Neible v. Chicago, B. & Q. R. Co.*, 107 Neb. 58.

It appearing that there was at least a several liability on the part of the Milwaukee to the shipper, subject to the sufficiency of the evidence on negligence, this action must be sustained.

The defendants claim as a defense that the conduct of the Milwaukee in removing the cattle from the train and detaining the shipment at Savanna, Illinois, without notice to the caretaker in charge, was required by the provisions of the "twenty-eight hour law" and that delay that ensued was wholly justified thereby.

So far as essential to the disposition of this case, the provisions of this federal enactment (28-hour law) are as follows:

"No railroad * * * common carrier * * * whose road forms any part of a line of road over which cattle * * * shall be conveyed from one state * * * into or through another state * * * shall confine the same in cars * * * for a period longer than twenty-eight consecutive hours without unloading the same in a humane manner, into properly equipped pens for rest, water, and feeding, for a period of at least five consecutive hours: * * * *Provided*, That upon the written request of the owner or person in custody of that particular shipment, which written request shall be separate and apart from any printed bill of lading, or other railroad form, the time of confinement may be extended to thirty-six hours. In estimating such confinement, the time consumed in loading and unloading shall not be considered, but the time during which the animals have been confined without such rest or food or water on connecting roads shall be included." 45 U. S. C. A., ch. 4, sec. 71.

The main purpose of this act is to prevent cruelty to animals in transit, and the duty of seeing to compliance with these requirements is placed on the carrier. *United States v. Oregon R. & N. Co.*, 163 Fed. 640; *United States v. Philadelphia & R. R. Co.*, 223 Fed. 206; *Atchison, T. & S. F. R. Co. v. Hill*, 171 S. W. (Tex. Civ. App.) 1028.

This act was not primarily intended for the benefit of the owners; it is restrictive of their rights. *Baltimore & O. S. W. R. Co. v. United States,* 220 U. S. 94.

It necessarily follows that the right vested in the owner to extend the period of confinement from 28 to 36 hours is a valuable right, and by fair implication the duty of affording a reasonable opportunity for its exercise is imposed on the carrier.

The following rule has long been established in American jurisprudence: "But even though, by virtue of the contract under which the animals are carried, it is the duty of the shipper to attend the animals, provide for their wants and protect them from injury to themselves, yet if the carrier fails or refuses to furnish the shipper reasonable opportunities and facilities for performing the duties which he has undertaken, the carrier will be liable for the injury thereby sustained." 2 Hutchinson, Carriers (3d ed.) 708, sec. 641.

This act is not criminal, nor is it subject to strict rules of construction or of evidence as applied to a criminal prosecution. *Montana C. R. Co. v. United States,* 164 Fed. 400.

In construing the language of this controlling statute, in *Wabash R. Co. v. United States,* 178 Fed. 5, 9-11, Judge Sanborn employs the following language:

"The plain object of this clause of the act (requiring the request for extension to be separate and apart from any printed bill of lading or other railroad form) was to make it certain that the owner or person in custody of the shipment should know, when he made the request, that he was making it, and should exercise his judgment and choice in the matter. Its purpose was to prevent the concealment of the request in any railroad form which treated of other subjects or contained other terms that might withdraw the attention of the signer from the request, and cause him to sign it without knowledge that it was there, or without a conscious exercise of his option. The end sought is as perfectly attained by a separate request upon a railroad form

as by one upon any other piece of paper. The solicitor of the department of agriculture, to which the administration of this law is entrusted, held in 1906 that it was not intended to prevent a railroad company from printing an appropriate request to be used exclusively for the purpose of enabling owners and persons in custody of shipments to make with more clearness and facility the request that the confinement of their animals in transit should be extended to 36 hours. No persuasive reason for a departure from that ruling has been presented, and our conclusion is that a request upon a railroad form, separate and apart from a bill of lading or other railroad form than one which contains the request alone, is a compliance with the statute. * * * While there are statements in the debates upon the bill, as has been stated, that one of the purposes of the permission to extend the time of confinement upon a request was that the person in custody during the transportation might provide for an unanticipated emergency, there are also clear statements in those debates that another of the purposes of the permission was to enable those owners, whose cattle were shipped from points more than 28 and less than 36 hours' run from their destination, or from pens suitably equipped for unloading, watering, feeding, and resting them, to avoid unloading them on the way. It is much more cruel and injurious to cattle and sheep to unload and reload them than it is to continue their confinement 8 hours when the 28-hour limit is reached. This fact was repeatedly called to the attention of the members of congress during their consideration of the bill, and there can be no reasonable doubt that they intended to make the permission granted broad enough to attain this end."

The Milwaukee was advised when this shipment was turned over to them, and that it was for the following Monday's Chicago market. The conductor, when inquired of as train No. 82 was approaching Savanna, as to when such train would arrive at Chicago, had previously had submitted to him the contracts on which the shipment was carried. On these contracts the time since the last unload-

ing of the shipment clearly appeared. His answer to the caretaker's inquiry disclosed that ample time remained to complete the movement before the expiration of the 28 hours.

Thus, the result of a careful analysis of the entire situation, as disclosed by this record, supports the necessary conclusion that the defendant Milwaukee seeks to justify its action by a "ten-hour rule," not approved by the interstate commerce commission, forming no part of any public schedule or any public notice, not included in the shipping contracts, and of which neither the shipper nor caretaker was given information, and as to the existence of which no members of its train crews who participated in the movement appear to have been advised. In fact, the representations made on which the shipment was obtained by the Milwaukee fairly by implication tended to negative its existence, and to create in the minds of shipper and caretaker a belief that no extension of the 28 hours' running time would be required. Obviously the Milwaukee, under the conditions that surrounded this shipment, was grossly negligent in failing to communicate the substance of the "ten-hour rule," as it existed at Savanna, to the caretaker, and affording him an opportunity to execute the written request for the extension of the time of confinement of these cattle to 36 hours. All parties admit that this extension would have permitted the stock to arrive at the Chicago Stock Yards in due time for the Monday market. The facts in the record, therefore, must be deemed ample to support the jury's verdict as to the liability of the Milwaukee for damages established by the proof. This view of the situation also justifies the trial court's refusal of instructions requested by defendant Milwaukee relating to this subject.

Proof as to items of damages actually occasioned by the delay is not seriously questioned, save and except as to "excess shrinkage." The defendant Milwaukee contends that the jury included in its verdict the sum of $449.45 for "excess shrinkage" and interest thereon. It cites the case of *Underwood v. Chicago & N. W. R. Co.*, 100 Neb. 275, in

support of its contention that "shrinkage in weight * * * must be proved by competent evidence, and cannot be established by mere opinion evidence." However, Letton, J. (author of the opinion in the *Underwood* case), in *McElwain v. Union P. R. Co.*, 101 Neb. 484, 488, as to the doctrine announced in the *Underwood* case on the point under consideration, says in part: "This was correct as applied to the facts in that case (*Underwood* case), but is not correct as a general rule." And the doctrine of the *Underwood* case was accordingly distinguished and qualified.

In the instant case, the best evidence which was possible to obtain under the surrounding conditions, the testimony of experts, was adduced. Under the general rule, referred to by Judge Letton, this class of evidence was competent and sufficient, if believed, to support the verdict as to the item of excess shrinkage here questioned. *McElwain v. Union P. R. Co.*, 101 Neb. 484.

It follows that the district court was correct in its disposition of this case, and its judgment is

AFFIRMED.