FIRST NATIONAL BANK OF HASTINGS, APPELLEE, V. JOE M. DAVIS ET AL., APPELLANTS.

FILED MAY 24, 1932. No. 28101.

*Peterson & Devoe, Charles E. Bruckman* and *Tibbetts & Hewitt,* for appellants.

*R. O. Canaday, Stiner & Boslaugh* and *Edmund P. Nuss, contra.*

Heard before ROSE, DEAN, GOOD and DAY, JJ., and THOMSEN, District Judge.

THOMSEN, District Judge.

This action is brought upon a guaranty signed by the defendants. The trial resulted in a verdict and judgment against all the defendants in the sum of $85,158.65, and all, except one, have appealed.

The guaranty is the last of a series of eight successive renewals extending over a period of almost three years, the first of which arose through the purchase of the assets of the Exchange National Bank of Hastings by the First National Bank of that city. In the contract of purchase the First National Bank assumed and agreed to pay the liabilities of the former bank, but apparently the safe

assets of the seller were insufficient to equal the liabilities assumed by the buyer and the guaranty arose by reason of this inadequacy.

A short time prior to December 6, 1926, the Exchange National Bank found itself with insufficient cash to meet demands. It had had a run which had just about depleted its available and procurable cash. Efforts toward assistance from local banks had been made. Finally, the government bank officials were called in, and the officers of the First National Bank of Hastings were induced to confer with a view toward consolidation. A long conference resulted in the plaintiff bank assuming all the liabilities of the Exchange National Bank and taking the latter's assets. Some of the assets were purchased outright. Those considered undesirable remained under control of the plaintiff, but with a liquidating agent, one of the officers of the Exchange National Bank, for liquidation, the proceeds to be turned over to the First National Bank. The difference between the total liabilities assumed and those assets purchased outright left a sum of $261,913.60. The guaranty of the defendants, a separate contract from the sale agreement, was in the sum of $161,913.60.

The contract of sale provided that the seller should execute and deliver to the buyer two notes, one for $735,511.12 and one for $100,000 payable in 90 days. This was done. This aggregate amount, $835,511.12, represented the seller's liabilities which the buyer assumed and agreed to pay. The buyer, in the contract, agreed to credit on the larger note the agreed value of assets purchased outright, $573,597.52, leaving a balance on the larger note of $161,913.60. The $100,000 note the parties expected to be paid by the stockholders of the selling bank, that being the aggregate amount of such stockholders' double liability. The defendants were the directors of the selling bank. In their guaranty contract with the buyer the defendants assured the payment of "part of said notes and * * * part of the indebtedness represented thereby," limiting their liability, however, to the sum of $161,913.60.

The liquidating agent of the Exchange National Bank ultimately collected, in successive stages, and remitted to the First National Bank sufficient to reduce the total debt to the sum of $103,500. In the meantime renewal notes in decreasingly smaller amounts representing the total indebtedness were given by the Exchange National Bank to the First National Bank. Upon the first renewal and thereafter the total indebtedness was represented by but one note instead of two. As each successive renewal note was signed by the Exchange National Bank, a new guaranty, a separate contract, each assuring payment to the extent of $161,913.60, was also signed by the defendants, the last of which was signed on September 15, 1929, when the total remaining indebtedness was but $103,500.

The dispute of the parties arises chiefly from the following: That the plaintiff, among other things, included in the first renewal note an unpaid balance on the $100,000 note; that the plaintiff also included in such note an item of $45,622.32, the aggregate face value of notes among those originally purchased outright but returned by the buyer to the seller.

The first item constituted a balance of approximately $36,300 and interest due from defendant, Charles G. Lane. Real estate of Lane had been conveyed by Lane to the buyer. The guarantors contend this conveyance to have been in satisfaction of this item and that their guaranty was never intended to extend to any part of the $100,000 note. The plaintiff says the conveyance was a mere additional security.

Of the second item, the one of notes returned, the buyer contended the notes to have been misrepresented, and added their face value to the renewal note. Later, approximately $30,000 of these returned notes was collected and the proceeds paid to the plaintiff. Each subsequent renewal note and renewal guaranty included the remainder of the indebtedness due from all these items.

The complaints presented by the defendants are mostly in claimed errors in the giving of instructions and in the refusal to give requested instructions.

Among the defenses pleaded, and upon which testimony was admitted, were the following: That the $100,000 note was to be paid by the stockholders in proportion to the amount of stock held by them and was ultimately so paid in either money or property; that, after crediting the property purchased outright, the difference between that sum and $735,511.12 (the larger note), $161,913.60, should be guaranteed by the defendants, and that the remaining property should be used in the payment of this guaranteed amount, the defendants to be liable only for the balance remaining, if any, after exhausting such property; that, if such property brought an amount in excess of the guaranteed sum, such excess should be applied on the $100,000 note; that the foregoing constituted the oral contract between the parties; that the written contract was intended to express these terms. The written contract used was in part a form submitted and requested to be used by the federal bank examiner. After the contract was drawn, and subsequently, defendants claim the assurance of the officers of plaintiff and plaintiff's attorney, upon which they relied, that the foregoing was the meaning and intent of the written contract. Defendants further claim the contract to be ambiguous, in that the several guaranties were interpreted by them, not as claimed by plaintiff as a guaranty of the whole indebtedness to the extent of the limited amount, but, as they claim to have understood, a guaranty of that portion only of the indebtedness represented by the difference between the larger note and the amount of property purchased outright; and that, though it could mean either, under all the facts and circumstances it meant the former; that the ambiguity is contained in the following portion of their guaranty: "And the First National Bank of Hastings has required further security and guaranty for the payment of a part of said notes and for the payment of the part of the indebtedness represented thereby." It is further claimed that the parties were mutually mistaken in believing the written contract represented the oral one.

In the court's instructions the first 19 pages are devoted to practically a copy of the pleadings. Though clear to a lawyer, it is hardly probable that the ordinary jury could intelligently digest the involved facts pleaded, or with any clarity comprehend the issues which the pleadings present. This form of stating the issues has several times been disapproved. "A clear, concise and terse statement of the issues is much to be preferred to the involved legal verbiage often found in formal pleadings, and is much more easily apprehended." *Hutchinson v. Western Bridge & Construction Co.,* 97 Neb. 439; *Forrest v. Koehn,* 99 Neb. 441.

Following the statement of the pleadings, the court briefly instructed the jury what the plaintiff was required to prove in order to recover, most of which was admitted by the pleadings; stated what the defendants were required to prove, as will hereinafter be noted; gave an instruction on the preponderance of evidence and credibility of witnesses; defined a mutual mistake as "one common to both parties to a written contract, each laboring under the same misconception;" defined a guaranty and briefly what constituted an ambiguous contract; and ended the instructions by the customary instruction on retirement of the jury, and the five-sixths verdict.

In instruction No. 3 the court submitted to the jury what the court stated to be three defenses to the plaintiff's petition, as follows: "(1) That there was a mutual mistake in drawing the contract of guaranty; (2) that the contract of guaranty is ambiguous; (3) that there were misrepresentations made by the agents and officers of plaintiff to the defendants, which caused the defendants to sign said guaranty." And further stated that, if the defendants had proved any one or more of the foregoing defenses by a preponderance of the evidence, the verdict should be for the defendants.

The attack of the defendants on the instructions, particularly this one, has merit. The plaintiff says that the defendants cannot complain, for since the jury were per-

mitted to speculate as to what these matters were, and had an unlimited field of speculation, the instruction was more favorable to the defendants than they deserved, and therefore not erroneous. Were the jury composed of men superior to the average, the plaintiff's conclusion might be justified. But the instruction lacks clarity and is disturbing in an attempt at application. If the instruction were taken literally, it might well be said that the jury were mistaken in returning a verdict for the plaintiff, in that at least the contract upon which suit was brought, the last of the series of renewal guaranties, could easily have been said to be, in a larger sense, ambiguous, in that the limit of liability stated in the guaranty exceeded the amount of the note which the guaranty was given to secure. Were it not for the explanation in the record that this guaranty had been copied by a stenographer in the bank's office, and that in copying the successive renewal contracts she had left the limit of ultimate liability the same, the guaranty would be unintelligible.

With no other guide than the three numbered clauses in the criticized instruction, the jury might very well reason from circumstances under which not one of the three matters as submitted ought to have any effect on the contract or ought to be a defense, to minimize the importance or pertinency of the defenses offered. How could the mere fact that a mutual mistake existed in drawing the contract, that the contract was ambiguous, that misrepresentations had been made by officers of the plaintiff, or any one of these, without more details, affect the defendants' rights? If the jury were permitted to speculate on these questions, they might as well require more serious matters to warrant a finding of mistake, ambiguity, or misrepresentation, than even those matters claimed by the defendants. If permitted to speculate, what assurance could be given that the speculation would not be to defendants' disadvantage rather than to their advantage; that the burden of proving facts would not be greater than their defense theory required? Furthermore,

at the close of this instruction the jurors were told that, if the defendants failed to establish one or more of these three propositions, the verdict should be for the plaintiff. However, the evidence should fail to establish *all* these defenses to have this result.

The case was one involving a large amount, the issues were complicated, a great mass of testimony (the record being over 1,000 pages) was presented, and it might well be assumed that more than usual attention would be paid by the jury to the court's instructions and that from these the jury would seek more than ordinary aid. The defendants were entitled to have the jury told clearly what the defenses were, to have the jury told of what the claimed "mutual mistake" consisted; the interpretation which the defendants had placed upon the contract, and in what respect the contract was claimed to be ambiguous; also of what the claimed misrepresentations consisted; and thus have the jury told the elements necessary for defendants to establish. If the court had directed the jury's attention to paragraphs in the answer in which these matters were set forth, or in any way centered the jury's attention upon the rights claimed to have been invaded and cast the burden upon defendants to prove such facts, the jury might have been assisted by such instruction.

Since the facts and circumstances were in dispute, and doubt existed as to the exact meanings of the words used and whether the contract properly expressed the real intention of the parties, the court properly admitted evidence to leave the problem to the jury for solution. *Coquillard v. Hovey*, 23 Neb. 622; *Rosenthal v. Ogden*, 50 Neb. 218; 2 Williston, Contracts, sec. 616; 4 Page, Contracts, sec. 2063. But the rule is: "In such cases the court should submit the question of fact to the jury under proper alternative instructions as to the construction to be given to the contract in the event of each possible finding of fact by the jury." 4 Page, Contracts, sec. 2063. See *Coquillard v. Hovey, supra.* This the court failed to

do. The court was not without aid. A number of appropriate instructions were offered by the defendants. Instructions Nos. 2, 5, 6, and 7 of those requested by the defendants related to details of defendants' theory of the case, would have proved helpful and should, under the evidence, have been given. The substance of these appeared nowhere else in the instructions. Tendered instructions Nos. 1 and 3, although failing to include for the jury's consideration all other facts and circumstances, these, and the others mentioned, presented sufficient to have furnished some inspiration for appropriate instructions to direct the jury in their deliberations. The defendants were entitled to have the instructions fairly and clearly submit the theory upon which the case was tried. This the instructions failed to do.

One other matter is to be noted. Plaintiff contends that defendants are estopped by reason of successive renewals of the guaranty to claim any of the defenses pleaded. Waiver and estoppel *in pais* are closely akin. Either would defeat defendants' claims. However, in both the facts must actually be known by defendants to have this result. 27 R. C. L. 904, 908, 909; 10 R. C. L. 692; *Cech v. Costello*, 117 Neb. 224. A strong analogy may be found in negotiable instruments. There, without knowledge, no loss or waiver of rights follows renewal when the action is between the original parties. *Exeter Nat. Bank v. Orchard*, 39 Neb. 485; *Davis v. Thomas*, 66 Neb. 26; *Auld v. Walker*, 107 Neb. 676; *Shawnee State Bank v. Lydick*, 109 Neb. 76; *Shawnee State Bank v. Vansyckle*, 109 Neb. 86; *Berwyn State Bank v. Swanson*, 111 Neb. 141; *Nebraska State Bank v. Walker*, 111 Neb. 203. The evidence indicates a lack of knowledge on the part of defendants of the facts necessary to constitute an estoppel. No knowledge of facts is shown by the answer. Although the fact of repeated renewals may, under circumstances, prove strongly persuasive to a jury, as a matter of law we do not find that the defendants have either waived their defenses or are estopped to raise them.

We have devoted days to a careful consideration of all the testimony and the briefs of counsel. The case may have been rightly decided, but we have reached the conclusion that the defendants have not had a fair and impartial trial due to the failure of the court properly to instruct the jury. Therefore, the judgment is reversed and the cause remanded.

REVERSED.