ROBERT R. MERRITT, APPELLEE, V. ASH GROVE LIME & PORT-
LAND CEMENT COMPANY, APPELLANT.

285 N. W. 97

FILED MARCH 31, 1939.   No. 30417.

*William R. Patrick* and *William H. Herdman,* for appellant.

*Waldron, Newkirk & Mathews, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

PAINE, J.

This is an action in tort for damages to leasehold for the destruction of lakes in sandpits used in hatching rainbow trout, and for the value of fish destroyed by overflow of the Platte river near Louisville, Nebraska, caused by obstruction and damming the flow of the river by the defendant. A judgment was entered upon the verdict in the sum of $4,000. Motion for new trial overruled. Defendant appeals.

The amended petition charges that the Ash Grove Lime & Portland Cement Company, a corporation, which will hereinafter be called the defendant, has its principal place of business northeast of Louisville, Cass county, Nebraska, being engaged in mining and quarrying rock and stone, and the manufacture of lime, cement, and other products; that Robert R. Merritt, the plaintiff, has been engaged in the business of hatching and rearing fish, for which purpose he owns and manages a fish hatchery for stocking public and private streams; that on March 1, 1935, plaintiff leased from the trustees of the Lyman-Richey Sand & Gravel Company approximately 73 acres of land and lakes adjacent to the Platte river, and directly across from the mines, quarries, and plant of the defendant, which are located along the south or easterly bank of the Platte river; that the said lease was for a term of three years, and contained an option to purchase such real estate for $50 an acre. Under the lease the plaintiff had the privilege of erecting buildings and fences, constructing ponds and dikes, placing pipes for conveying water, and improving

the property generally for growing fish, and for all other purposes except the sale of sand and gravel. There were four lakes upon the premises, formed by deep dredging operations, the water therein being pure, clear, and cold, and fed by underground streams, and kept at an even temperature, thereby being particularly adapted to the rearing of trout, and said premises constituted a valuable site for the fish hatchery business, and as a private fishing resort. It is further alleged that the plaintiff made extensive and valuable improvements on the premises, including dikes, drains, pipes, flume, screens, landscaping improvements, rearing-pools for fish, tool and implement house, and a five-room residence for the plaintiff's family; that prior to the wrongful acts of the defendant corporation the premises constituted a valuable site for the fish hatchery business and a private fishing resort; that from time immemorial the Platte river had run in an ample, deep, and well-defined channel along the base of the high hills across the river from plaintiff's premises, and at no time had the waters of the Platte river overflowed said premises; that the defendant, especially during the last two years, has wilfully, wrongfully, unlawfully, and tortiously continued to dump and discharge into said channel of the river enormous quantities of earth, stone, and other heavy waste materials, which constituted a complete, permanent obstruction and barrier to the flow of the river in its natural channel; that its flow was impeded and dammed up by such obstructions dumped by the defendant; that on March 5, 1936, the dammed-up waters were diverted and turned aside to the westward, washing away the dike and railroad embankment, and rushed through, over and across the plaintiff's premises, cutting an entirely new and permanent channel across the same, and totally destroying the lakes and improvements, and rendering the premises wholly unfit for any useful purpose, to the plaintiff's loss in the sum of $18,000, later amended.

The defendant, for answer to the plaintiff's amended petition, admits that plaintiff leased the premises and

took possession thereof about March 1, 1935, but alleged that the lease was canceled March 12, 1936; admits that there were four ponds or lakes on the leased premises, with a house thereon occupied by the plaintiff, but denies all other allegations in said amended petition contained.

The trial of this case in the district court began on November 1, 1937, and lasted for two weeks, and many witnesses were called by each party, and their testimony is found in four volumes of the bill of exceptions of more than 1,100 pages. There are also 80 exhibits, consisting of plats, blueprints, maps, four aeroplane photographs, one aeroplane mosaic, together with letters and many photographs, some recent and others taken many years ago. To adequately present all of the facts in the case, and the law relating thereto, an argument of one hour on each side was allowed in this court, and the case was taken under consideration, and recently a reargument of the whole case was ordered.

The defendant charges that the evidence does not sustain any recovery whatever for the plaintiff, and that the court should have instructed a verdict for the defendant.

Defendant claims in its briefs that the south channel was never permanently or even temporarily closed, other than by temporary ice lodging downstream below said dump, and that the uncontradicted evidence of its witnesses shows that the only cause of the ice jams which backed up water into plaintiff's premises was the insufficient depth of water in said channels to carry the abnormally thick ice past the lower end of Cornish Island. Defendant charges there is no proof that water which flooded plaintiff's premises was diverted thereto by any act of defendant, for no one saw any water diverted from the south channel to or upon the plaintiff's premises. Defendant claims plaintiff misrepresented as to the location of its dump, for it is located on the south bank of a bend in the river, and causes no interference whatever with the flow or volume of water passing that way. Defendant says that the uncontradicted testimony of three eminent engineers is that

the dump exerted no influence whatever upon the water and the ice at the time of plaintiff's damage, for the very obvious reason that said dump is 1,200 feet downstream on the opposite side of a large island, and over three-quarters of a mile from where the river broke through the flimsy sand levee into plaintiff's premises.

A careful examination of the evidence of plaintiff's many witnesses tells an entirely different story, supported in some particulars by defendant's witnesses, and would support and warrant the jury in finding that there is credible evidence that the great volume of water in the Platte river for many years flowed to the south of Cornish Island and over against the south bank, where the Burlington tracks ran along the bank, and where the Burlington railroad kept its tracks well riprapped from being washed out by the deep channel which flowed along the Burlington track.

One witness for plaintiff was Joel Cornish, an Omaha attorney, who testified that he was a son of former Supreme Court Justice Cornish, and was born down there, and for many years spent his summers at a summer house they had at Meadow, near Louisville, their home being on a hill above the river, and that he was frequently at Cornish Island, and played around the river and on Cornish Island many summers, and was there regularly every summer since 1931. He testified that in the early days the main channel of the Platte river came through toward the north end of the bridge, say four or five spans out, went straight across in front of Cornish Island, and flowed over to what was called the south bank of the river; that the water between Cornish Island and the main north bank of the river was always very shallow, except in extreme flood stage rarely more than knee deep, although there might have been some places a little deeper; that from 1931 to 1936 he observed the dumping operations of the defendant company; that he has been there and seen rocks splashing into the water from the dump, and that bars were forming out in that channel down below the

dump. He testified that Cornish Island was all in Sarpy county, and that in 1936 he was down there every two or three days up to a day or so before the flood; that he was there the next day after the water broke through, and that the water was not running south of Cornish Island immediately after the flood. He testified that his family formerly owned the land in controversy in this case.

Albert Cornish testified that he lived at Meadow, about a mile and a half from the Louisville bridge, on the north side; that his family owned Cornish Island before he was born, and he is now 30 years of age; that he waded over to Cornish Island many times during the early years; that he never waded from Cornish Island over to the south bank of the river.

The testimony, which the jury must have accepted, under the instructions of the court, was to the effect that before 1929 the defendant company commenced its hydraulic stripping, and ran a flume under the Burlington track, and the waste materials were washed directly into the channel on the south side opposite Cornish Island, the flume being moved up and down the river as the released materials piled up. Then the defendant company replaced the flume under the track by an overhead flume about 1931, and this carried the hydraulic stripping in the form of mud and rocks. These deposits built up a flat bar where the channel of the Platte river had been for some distance up and down stream, continually pushing the river farther out from its south bank. Hauling by truck began about 1932 of the dry earth, shale and rock, the trucks running out on a viaduct over the Burlington track, and dumping their loads off the end of a trestle. This dumping went on continuously until the date of the flood, March 5, 1936, which caused the damage to the plaintiff. Rocks rolled down the steep incline of the sides of this dump, which had become 70 feet high. Some of the rocks taken out by truck would weigh half a ton or more. The dump increased in size until it finally reached out for 420 feet of the entire 1,050 feet of open water between the south bank and Cornish

Island. The great bars formed of this material constantly narrowed the channel of the Platte river, as well as making it more shallow, which caused the immense amount of sediment always carried to make deposit above the dump proper.

The gradual stoppage of the current on the south side of Cornish Island forced a heavy flow of water across the upper end of said island, and overburdened the channel on its north side, which had an opening of only 210 feet at the lower end of Small Island.

For many years before the defendant's dumping into the river began, the ice breaking up each spring had been carried and readily cleared down the wide watercourse to the south of Cornish Island. When the ice break came in March, 1936, ice moved through and under the bridge and downstream, and lodged and jammed across the south channel from the defendant's dump over to Cornish Island, and then along the north channels next to Cornish Island, until all the channels were blocked with ice. About noon March 5, 1936, the water rising behind this ice jam forced itself at a sharp angle to the north and through the plaintiff's earth embankment, or dike, north of the river, which dike was about 20 feet in height, and through the Missouri Pacific spur track.

Plaintiff testified that the dike which separated his fish hatchery property from the river was not a frail affair, constructed from pumpings of sand, as the defendant claims, but was made of black dirt, stripped off the top, and placed there with a dragline.

Plaintiff's testimony supports his contention that at the time of the flood there was no ice gorged at either of the bridges; that the spans of the highway bridge and the railway bridge were 60 feet long, there being about 20 spans in each of the bridges; that there was no ice between the bridges; that there was no ice jam upstream from the bridges; that the piles from old bridges did not cause a jam, for the high water was flowing 10 or 12 feet over the tops of these old piles; that the flood of water finally

broke through the embankment at about noon; that one of the two breaks was right on his property; that it took about an hour to wash right through the embankment; that the railroad embankment washed out within 60 feet of the house.

It is impossible to set out in greater detail the large amount of evidence relating to the effect of the defendant company's dumping enormous quantities of earth, rock, shale, and other waste materials into the Platte river in its stripping operations to quarry the rock to manufacture lime and cement. Evidence clearly indicates that this dumped débris constituted an obstruction over 1,100 feet in length and over 400 feet wide. Upon and against this obstruction an ice jam formed, backing the water up, and on March 5, 1936, the water, rising for some distance upstream because thereof, finally was forced at a sharp angle through a dirt embankment, or dike, and through a spur track of the railroad track, which it tore out, and then rushed through the entire length of plaintiff's property. The fish were all washed down the Platte river; his hatchery plant was destroyed; only about one-tenth of an acre of land was left, with the house and a portion of the tool-house remaining. So far as the evidence is concerned, the jury were warranted in returning a verdict for the plaintiff.

We will now consider the propositions of law relied upon by the defendant for reversal. Its first two propositions of law are: That the trial court rejected instruction No. 1 offered by the defendant, which undertook to set out very briefly the contents of the amended petition and answer, the same constituting less than a page; and, instead, gave as instruction No. 1 three pages, to which the trial court had condensed the six pages of the amended petition and answer. It is argued by the defendant that this court has frequently criticized and condemned the practice of copying pleadings into instructions, and that the error is so flagrant in the case at bar that the defendant, anticipating that such a contingency would arise, and the

fatal effect thereof, tendered its instruction No. 1, which stated the issues in conformity with the rules of this court.

Defendant cites *Murray v. Burd,* 65 Neb. 427, 91 N. W. 278, and *Murphey v. Virgin,* 47 Neb. 692, 66 N. W. 652, which hold that copying pleadings into the instructions may be ground for reversal unless the error is without prejudice.

The defendant also cites *First Nat. Bank v. Davis,* 123 Neb. 304, 242 N. W. 655, in which the practice of copying pleadings is disapproved and held to be prejudicially erroneous. · In examining the transcript in that case, it appears that it involved intricate questions in regard to a guaranty, and other legal documents, signed by a number of defendants and given to the First National Bank of Hastings, and the jury rendered a verdict for $85,158.65. The court's instructions to the jury were most unusual, for they began with an "introductory statement" of the case, 19 pages long, which embodied the substance of all of the pleadings in the case, and then followed the regular instructions Nos. 1 to 9, inclusive. It is stated in the opinion that the ordinary jury could not digest the involved facts, or comprehend the issues, as set out in the 19 pages of such preliminary statement of the case, and held that the instructions did not clearly submit the theory upon which the case was tried.

This court stated in *Hutchinson v. Western Bridge & Construction Co.,* 97 Neb. 439, 150 N. W. 193, that it was reversible error to include in the instructions of the court allegations of fact found in the petition but which had not been supported by any evidence.

On the other hand, in the recent case of *Scott v. New England Mutual Life Ins. Co.,* 128 Neb. 867, 260 N. W. 377, the same question was again before this court, and our holding there was that it is not error for a trial court to incorporate in its instruction defining the issues the substance of the pleadings which set forth such issues.

It therefore appears that, if the pleadings give a simple statement of facts constituting the cause of action, and

the defense thereto, in ordinary and concise language, without repetition, as prescribed in section 20-804, Comp. St. 1929, and upon the trial the evidence tends to support such facts, then there is no harm in embodying a synopsis of such statements from the pleadings in an instruction to the jury, especially where, as in the case at bar, the trial court, at the close of instruction No. 1, which embodied the facts set out in the amended petition and answer, added this sentence: "The foregoing are merely a statement of the claims of the parties, and, except as to admissions, are not to be taken as evidence." Such an instruction, followed by this plain statement at the end, could not confuse the jury, and does not support the charge of the defendant that it was inevitably prejudicial.

In the opinion of this court, this proffered instruction No. 1 did not as fairly or adequately present all of the pertinent issues as the instruction No. 1 given by the court, and even if it be admitted that the court's summary might have been shortened somewhat, we still fail to find anything prejudicial in it.

Defendant's requested instruction No. 3 set out that, before the plaintiff could recover a verdict, he must prove by a preponderance of the evidence that his damage was caused solely by the unlawful diversion of the main channel of the stream, and by no other causes or contributing causes. The court refused to give instruction No. 3 as tendered, but gave instead instruction No. 4, which embodied practically the same language as in the first paragraph of instruction No. 3 offered by the defendant, but changed the second paragraph entirely, and added a third paragraph, reading as follows: "However, in this connection you are further instructed that if you find by a preponderance of the evidence that the act of the defendant in dumping and discharging of materials was the proximate cause of the jam or gorging of ice in the river at or near the location of such dumping and that such ice gorge obstructed the natural flow of the river so as to divert the water of the river on and across the property occupied by the plaintiff

thereby causing damage to the plaintiff, your verdict will be for the plaintiff in the amount of the damages which from the evidence and these instructions you find were sustained by him."

The defendant attacks this instruction No. 4, citing section 20-1112, Comp. St. 1929, which states generally that, if the court refuses to give a written instruction as demanded, but modifies the same, such modification shall not be by interlineation or erasure, but shall be well defined, showing the changes.

Defendant charges that this action of the court was a clear violation of the statute, because the court in no way indicated that instruction No. 4, as given by the court, was a modification of instruction No. 3 requested by the defendant, and cites *Hunt v. Chicago, B. & Q. R. Co.*, 95 Neb. 746, 146 N. W. 986, in which it was held that the instruction as modified was prejudicial and constituted reversible error, and in *Hyndshaw v. Mills*, 108 Neb. 250, 187 N. W. 780, and *Goldman v. State*, 128 Neb. 684, 260 N. W. 373, and *Strubble v. Village of DeWitt*, 81 Neb. 504, 116 N. W. 154, it is held that, if instructions are offered which correctly state the law upon issues presented by the pleadings and supported by evidence received during the trial, it is error to refuse such instructions unless the points are fairly covered by other instructions given by the court on its own motion.

Defendant insists that the court has no right to make a proffered instruction state a different rule than the one therein given. We find that the section of the statute relied upon was adopted in the Laws of 1875, page 77, sec. 2. This was before the use of typewriters in courts, when instructions were laboriously written out in longhand, and provided that, if the court gave the instruction as submitted but with modifications, the court should clearly indicate the changes made. Even after the advent of typewriters, in the haste of a trial the presiding judge sometimes inserted in ink clauses modifying, or limiting, or expanding a statement in an instruction offered, and

clearly indicated, by his initials in the margin, or otherwise, that the instruction was rejected in the form offered, but as modified was given. Now, when judges have conveniently at hand official court reporters with typewriters, such practice is frowned upon, and judges should not modify a proffered instruction by making changes in it, but leave the instructions offered in the form in which they are tendered, so that in case of an appeal a record may be had of the exact instructions refused.

Now, in the case at bar, it is evident that the trial judge found the first paragraph of the offered instruction No. 3 was acceptable with minor changes. In the second paragraph he found suggestions which he used to some extent, but he found it necessary to add the third paragraph as set out above. In such a case, where the tendered instruction was not modified by interlineations or erasures, but the court simply adopted certain language therefrom in its own instruction, this does not in any way violate section 20-1112, Comp. St. 1929.

Defendant assigns as error the overruling of an objection to question No. 3972, as follows: "Q. Mr. Merritt, at the time you entered into this option, and referring especially to the clause in the option relating to improvements on the premises, 'By this lease party of the second part has the privilege of erecting buildings and fences, to make ponds, construct dikes, and place pipes for conveying water, and otherwise to improve the property for the purpose of growing fish, and all other purposes, excepting the production and sale of sand and gravel;' what was your intention when that provision was put in there and what were your intentions following that time with relation to going through with this option and taking this property up and paying for it? Mr. Patrick: Objected to as entirely speculative, immaterial, and self-serving in character. The Court: Overruled. Exception. A. I was intending to take up my option."

In the amended petition it was clearly set out that a covenant in the lease granted to the plaintiff the option to

purchase this real estate prior to March 1, 1938, for $50 an acre, and that the lease gave the privilege of erecting buildings, ponds, and dikes thereon for the purpose of growing fish, so that it became an issue in the case, for in the answer defendant admitted that the plaintiff took possession of the leased premises, with the four ponds or lakes situated thereon, and occupied the house thereon, but denied all other allegations relating thereto.

The defendant cites 1 Wigmore, Evidence, sec. 581, to the effect that a party should be disqualified from testifying to his own intent or motive, even where it is material to be investigated.

The plaintiff insists that the proper measure of damages, in an action in tort for injury done in making it impossible to carry out an option right, is the loss of, or damage to, the bargain which the option-holder has under his option contract, and that, in arriving at the value of such option contract which was destroyed by the unlawful acts charged against the defendant, it was not error for the court to admit in evidence competent proof that the holder of the option was ready, willing, and able to exercise his option, and but for the unlawful acts of the third person would have done so, and such evidence was given in this case by plaintiff.

In this connection, counsel for each side discuss at length the case of *Roper v. Milbourn,* 93 Neb. 809, 142 N. W. 792, in which it was held that an option to purchase a tract of land does not, before the acceptance of the option, vest in him an estate or interest in land, but that, in an action for breach of contract, damages that are fairly within the contemplation of the parties at the time they made the contract may be recovered. The same case came back to the court a second time in *Roper v. Milbourn,* 98 Neb. 466, 153 N. W. 557. Its first appearance here was from sustaining the demurrer to the petition, and the second appeal was from the trial of the main case, and it was again reversed because the jury disregarded an instruction which permitted a recovery for the loss of profits. The

court said: "The evidence is uncontradicted that plaintiff could have complied with the terms of his option and with his agreement to convey the title to defendant except for the latter's breach of contract." This court again reversed and remanded the case, upon the ground that the jury had not taken into consideration plaintiff's loss of profit. Two years later the case came to the court for the third time, and is found in 100 Neb. 739, 161 N. W. 277, and the verdict of the jury was affirmed.

In the last part of instruction No. 3 given by the court, which related to the option, it was said: "If you find from a preponderance of the evidence that the plaintiff's option to purchase this land at $50 per acre was a bargain in the sense that the fair market value of the option, as defined in these instructions, was a sum in excess of $50 per acre for the land, and if you further find from a preponderance of the evidence that the plaintiff, at the time of the flooding of this property, intended to purchase the land at $50 per acre, and was ready, willing and able, and had the financial ability to purchase it at that price, and, but for the flooding of the property by the acts of the defendant, would have purchased the land at that price, then plaintiff would be entitled to recover from the defendant any loss of, or depreciation in, the market value of his bargain, which you find he sustained at the time, and by reason of the flooding of the property. In computing depreciation in value, if any, of the plaintiff's interest as an option holder, under the rule of damages given you in these instructions, you cannot allow the plaintiff as damages any part of said option price of $50 per acre."

The plaintiff in the case at bar was granted the option to purchase at any time at the price of $50 per acre.

As stated in *Harper v. Runner*, 85 Neb. 343, 123 N. W. 313: "The option is part of the lease, and every provision in that instrument is supported by the identical consideration that vitalized all other parts thereof. * * * An option based upon a sufficient consideration for the purchase of real estate during a definite period cannot be withdrawn

before the expiration of that time, but vests the legal holder thereof with a right to acquire an interest in the land."

In 12 Am. Jur. 340, speaking of the protection afforded "property" under the Fourteenth Amendment to the Federal Constitution, it is said: "The property rights which are protected by the guaranty of due process are varied. No question arises over the more common forms of real and personal property. It is when the question arises over the less tangible forms of property that an inquiry into what is property must be made. It is a vested right which cannot be taken away except by due process of law."

In *Smith Co. v. Anderson*, 84 N. J. Eq. 681, 95 Atl. 358, the court said that an option in a lease to purchase lands is property.

As stated in *Harper v. Runner*, *supra*: "A subsequent purchaser who buys with knowledge that the occupant claims to have a contract for the purchase of the land is bound by the terms of that agreement, whether it is an option or an executory contract equally binding each party thereto."

In *Dengler v. Fowler*, 94 Neb. 621, 143 N. W. 944, the rights of an option-holder as against subsequent purchasers of the land are referred to as "equities."

In 84 A. L. R. 52, is a quotation from Professor Charles E. Carpenter in a note in 41 Harvard Law Review, 728, on "Interference with Contract Relations: Includes not merely the procurement of a breach of contract, but all invasion of contract relations, so that any act injuring or destroying persons or property which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promisee, may fall within its scope, it may be said that, the interest in a contract being a property right, a party thereto has a right of action against persons who are by their conduct substantially interfering with the performance thereof."

In 1 Restatement, Torts, 358, we are told that trespass on land is used in a broader sense than in common law;

that it includes soil, water, trees, and other growths thereon, and any structures erected thereon, or affixed thereto. And on page 381 it is said, in substance, that, if one enters land of another and destroys or removes therefrom a structure, or digs a well, or makes excavation thereon, or removes earth or some other substance therefrom, the possessor has a right for full redress.

Under the law as set out in instruction No. 3, the plaintiff was required to, and did, prove that he was ready, willing, and able to exercise his option.

If the jury found, as they did, that the defendant's wrongful acts caused the flooding and destruction of plaintiff's property, the wrong-doer should pay for the property and rights so destroyed, and we see no error in the ruling on the evidence relating to the option, or to the court's instruction.

The seventeenth assignment of error is the alleged misconduct of Juror Alfred Laschansky in visiting the *locus in quo* unofficially on Sunday, November 7, during the trial. Defendant insists that such conduct was highly prejudicial, and it was the duty of the trial judge to have granted a new trial.

It appears from the affidavit of Earl Mayfield, toll-taker on the bridge, that he saw Juror Laschansky in the vicinity of the toll-house on Sunday during the trial, and certain jurors made affidavits that Laschansky said he had visited the Ash Grove Lime & Portland Cement Company's plant and bridge on Sunday. As to whether he said this before or after the entire jury made their trip, is not shown.

We are cited to the case of *Kelley v. Adams County*, 113 Neb. 377, 203 N. W. 544, in which a verdict and judgment were reversed, and it was held that such act on the part of a juror disqualifies him as a juror. The decision was founded upon the case of *Chicago, B. & Q. R. Co. v. Oyster*, 58 Neb. 1, 78 N. W. 359, in which case it appeared that several jurors visited the switch track where the accident occurred in Holdrege. It is said that this was a gross irregularity on the part of the jurors, and that jurors must

base their findings upon the evidence adduced at the trial, and may not make an inspection of the *locus in quo* unless a view is authorized by the trial court; that when a juror, on his own accord and without permission, visits and makes an inspection of the premises, it may be sufficient cause for vacating the verdict, but it will not have that effect if it is plain that such an examination was not influential in obtaining the verdict, and it is said that the view at the time it was taken could have been of no practical assistance in reaching a conclusion, and could not have influenced or affected the result, and the judgment was affirmed.

In *Rush v. St. Paul City Ry. Co.*, 70 Minn. 5, 72 N. W. 733, a case was reversed for this reason: In the text it is said that it would be an injustice to deprive an innocent party of his verdict simply because there was a casual inspection of the premises by some of the jurors, or because the jurors were familiar with the premises, and if verdicts were set aside for such reasons there would be no reasonable limit to litigation, especially in cities where some of the jurors in every case may pass the place where an accident occurred. Jurors should be warned at the commencement of every trial not to examine the locality except by order of the court, and it is said that courts cannot tolerate jurors going out on a private search for evidence, making an inspection on their own accord, and then discussing the matter with their fellow jurors in the box. But there is no claim made in the case at bar that the plaintiff was guilty of any misconduct in the matter of this one juror visiting the *locus in quo* on Sunday.

In *Meyer v. Omaha & C. B. Street R. Co.*, 125 Neb. 712, 251 N. W. 841, one of the jurors, for the express purpose of satisfying himself as to whether or not a witness who had testified could see all that he testified to, boarded one of the street cars of a type similar to the one involved in the accident, rode on the same for several blocks, sitting in exactly the same position as the witness testified he was sitting in, and after so doing the juror came to the con-

clusion that the witness could not have seen what he testified to, and after the jury had retired for deliberation on the case this juror stated to his fellow jurors what he had done and the conclusions he had drawn regarding this witness' testimony. This court held, in an opinion written by Judge Horth, that such conduct on the part of a juror disqualifies him as a juror, and was prejudicial, and the judgment was reversed. See, also, *Cook v. Patterson*, 129 Neb. 16, 260 N. W. 696.

In the case of *De Porte v. State Furniture Co.*, 129 Neb. 282, 261 N. W. 419, three of the jurors testified that a juror, Knott, compared the injury to plaintiff's knee with one that Knott had received in the World War, and said that if he had to choose between a normal leg and $1,000 a month he would take the normal leg. Juror Knott had gone to the records and discovered that on the former trial a verdict in favor of the plaintiff for $3,000 had been set aside by Judge Redick, and Juror Knott inferred that the verdict was not large enough, and his argument may have influenced the jury in arriving at a verdict of $4,500 in the case.

In a suit for personal injuries, where the jury had returned a verdict for $4,000, Judge Hamilton, in the United States district court for Porto Rico, stated the rule as follows: "5. The fact that one of the jurors visited the scene of the accident, and inspected the place and the arc lamp of the defendant, during the trial, is not material, inasmuch as the jury, judge, and marshal afterwards did the same thing. If this private visit was material, all question was removed by the official visit. The juror could not have seen more at one time than the other." *Root v. Porto Rico R. L. & P. Co.*, 6 P. R. Fed. 323. See 46 C. J. 143.

At an early time in England jurors were selected for the personal knowledge which they had of the facts involved in the case, and their verdict was based largely upon this knowledge, but in modern times the verdict of the jury must be based solely upon the evidence introduced in the case, and the personal knowledge of jurors must not be al-

lowed to enter into their deliberation. A juror's personal knowledge does not always preclude him from acting as a juror, but while deliberating as a juror he must not make known any fact which was not testified to in court. In Nebraska the fact that jurors have acted on their own personal knowledge constitutes prejudicial error (*Falls City v. Sperry,* 68 Neb. 420, 94 N. W. 529), but it has been said that such error will not vitiate the verdict in the absence of a showing that prejudice has followed from it (*Chicago, B. & Q. R. Co. v. Oyster, supra*), or if the verdict appears to be a just one in view of all the circumstances. 17 Standard Ency. of Procedure, 539.

After thus reviewing some of the decisions relating to the conduct of jurors as affecting the verdict, let us review the facts in the case at bar.

In the affidavit of L. R. Newkirk, plaintiff's attorney, it is stated that, after an expression in open court by the members of the jury that they would like to be permitted to view the location, he moved the court that the jury be allowed to do so, in custody of the sheriff; that a discussion was held by the court, in the presence of, but not in the hearing of, the jury, and that W. R. Patrick, attorney for defendant, stated that he wished to accompany the jury or be present when such inspection was made, to which affiant objected; that the court thereupon stated that he would accompany the jury when the inspection was made, whereupon Mr. Patrick stated that, if the court accompanied the jury on such inspection trip, he would make no objection to the jury viewing the premises in question. The court gave the jury the usual admonition that they were to refrain from discussing the case, to allow no one to discuss it with them, and not to make up their minds on the merits of the case until it had been finally submitted to them, and the trip was taken during the noon recess.

An affidavit of Will Sautter, one of the jurors, said he heard mention that Alfred Laschansky, a juror, made a visit to the location prior to the inspection by the jury as a whole, but he heard no mention or discussion, either by the

said Alfred Laschansky or any one else, as to what said juror had observed on the occasion of his visit, and that said juror, Alfred Laschansky, during the first part of the deliberations of the jury, was opposed to a verdict for the plaintiff.

The fact that thereafter all of the jurors, in company with the trial judge and sheriff, went over the location, and viewed it from vantage points, removes the prejudicial character of the conduct of this juror, especially in view of the section of the statute (Comp. St. 1929, sec. 20-853) which says that the court must disregard any error or defect in the proceedings which does not affect the substantial rights of the adverse party, and no judgment shall be reversed or affected by reason of such error or defect, and in view of this statute this court cannot say that the action of the juror was prejudicial to the rights of the defendant.

We now come to the objections made to the amount of the verdict. Defendant states in his reply brief: "Plaintiff's claim of damage is not only imaginary, but so fantastically inflated that it deserves little consideration." This court should not allow a verdict founded upon an imaginary claim to stand. Therefore, we will examine briefly the plaintiff's evidence upon which the jury based their verdict of $4,000.

The plaintiff testified generally to the effect that all his life he had been a fish culturist; that he found this unusual layout of deep lakes, fed underground by clear water, which was ideal for the business of raising rainbow trout; that he leased the tract of land embracing these lakes, with an absolute option to buy. He then proceeded to develop a private fish hatchery and resort, where sportsmen could catch trout. He spent all of his own time, worth $1,750 a year, and $3,600 in cash, on improvements and in making runways and spillways, and developing this fish hatchery, the whole expenditure amounting to over $7,000. As a result, he had something over 5,300 large rainbow trout, averaging 15 to 18 inches long, and weighing an average of a pound and a half apiece. The males could be sold on the market at 50 cents to a dollar a pound. There were over

2,500 females which had begun to spawn, and were worth $5 to $6 apiece, as they would each spawn about 2,500 eggs, worth $2 to $2.50 a thousand on the market. The process of spawning is for the eggs to be pressed from the female during December, January and February, and placed in a small pan containing a quarter of an inch of water, and the milk from the male is taken at the same time and by the same method. The eggs from the female are flat and deflated, but after the germs enter and cause fertilization the egg is very much enlarged. They first put in 5,200 or 5,300 fingerling trout. They are counted accurately by the displacement method. Putting these small fish in a measuring tank raises the water 20 ounces for a thousand fish. These fingerlings run from six to eight inches long when they are a year old. The fish are fed a balanced ration of a mixture of meat and cereal, sometimes cooked and sometimes raw, and you see the fish as they are fed. Fishermen often caught the large trout on a line, and then paid for them at the rate of five cents an inch and took them home.

Plaintiff testified that the fair and reasonable market value of his option immediately prior to the flood in March, 1936, was $10,000 over and above the price that he had to pay for it; that immediately after the flood it was absolutely worthless.

The river had never gone through or over this railroad grade before. In less than one hour the water tore out the embankment and railroad grade, rushed the entire length of the lakes and property occupied by the plaintiff's fish hatchery, and entirely destroyed it.

It may be admitted that this case was most vigorously contested, thousands of objections being made to evidence; that there is scarcely an item in the evidence of the plaintiff which some witness of the defendant did not controvert, but these facts were all submitted to the jury, who visited the place in question, saw the situation of the dump, the island, the bridges, and must have accepted the evidence of the plaintiff's witnesses as to how the plaintiff's property was destroyed, and reached the conclusion that it was de-

stroyed by the enormous amount of material dumped into the wide channel of the Platte river between the south bank and Cornish Island by the Ash Grove Lime & Portland Cement Company, defendant.

We have examined the other assignments of error, but cannot discuss them, and find none of them prejudicial.

In the opinion of the court, a reading of this evidence fully supports the verdict of $4,000. There being no prejudicial error in the record, the judgment is hereby

AFFIRMED.

CARTER, J., dissenting.

The opinion of the majority shows that defendant dumped quantities of earth and rock into the south channel of the Platte river near its plant. It also shows that, at the time of the high water which caused the damage, there was an abnormal flow of ice. That an ice jam was formed is not disputed. The opinion recites that as a result of the ice jam the water of the river was backed up and caused to flow north of Cornish Island and through plaintiff's land, causing the damage of which complaint is made. The opinion does not show that any witness saw where the ice jam commenced to form. There is no expert testimony that the piling of the débris on the south side of the river caused the ice jam. On the contrary, three expert witnesses testified that defendant's operations had nothing to do with the flood or the damaging of plaintiff's property. The logic of the majority opinion seems to be that because débris was piled along and in the river, and subsequently an ice jam formed and a flood occurred causing plaintiff's damage, defendant's operations must have been the cause. Disregarding entirely the evidence of the experts to the contrary, I submit that the finding of liability, so far as the opinion of the majority is concerned, is based wholly on speculation and conjecture. Whether the cause of the ice jam was an abnormal flow of ice, or other obstructions in the river, or defendant's operations, has not been established by the evidence. The burden of proof was on the plaintiff to establish liability. The recitations in the majority opinion do

not show that plaintiff maintained the burden that the law casts upon him. Under our holding in *Welsh v. Platte Valley Public Power and Irrigation District*, 135 Neb. 441, 282 N. W. 385, when applied to the facts as stated in the majority opinion, plaintiff is not entitled to recover. If the facts stated in the majority opinion are sufficient to sustain a judgment, this defendant is subject to suit for all the damage done by the Platte river not only at the time in question, but every time damage is caused by an ice jam or high water at or near defendant's plant. That the law should fix such a liability by speculation, conjecture and supposition seems incredible to me. For these reasons I cannot agree with the opinion of the majority that liability has been established.