FAIRMONT CREAMERY COMPANY, APPELLANT, v. CHARLES M. THOMPSON, TRUSTEE, APPELLEE.

298 N. W. 551

FILED JUNE 6, 1941.   No. 31094.

*Leonard A. Flansburg, M. S. Hartman, Edith Sanders* and *McKenzie & Dugan,* for appellant.

*Wymer Dressler, Robert D. Neely, Hugo J. Lutz* and *W. L. Barnett, contra.*

Heard before PAINE, CARTER and MESSMORE, JJ., and ELDRED and TEWELL, District Judges.

CARTER, J.

This is an action upon a bill of lading to recover for loss caused by a breach of contract to safely transport a carload of dressed poultry, butter and eggs from Omaha, Nebraska, to Hartford, Connecticut. The trial court directed a verdict in favor of the defendant railroad company, and plaintiff appeals.

The record discloses that on March 13, 1936, plaintiff shipped the produce to Hartford by way of New Haven. A part was unloaded in transit at New Haven and the balance transported to Hartford, the agreed value of the produce shipped on to Hartford being $2,403.69. The car arrived in the yards of the New York, New Haven & Hartford Railroad Company on March 19, 1936. Shortly after the arrival of the car of produce, an unprecedented flood of the Connecticut river swept through the railroad yards, totally destroying the produce. The railroad company contends that there is no liability on its part under the terms of the contract, providing that "No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God." Plaintiff contends that the loss was due to negligence of the defendant and its connecting carriers and was not the result of an act of God as it is known to the law.

It is not disputed that plaintiff may properly maintain this action against the defendant as the initial carrier of an interstate shipment under the provisions of the Carmack Amendment to the Interstate Commerce Act. 49 U. S. C. A.

sec. 20 (11) ; *McGinley v. Union P. R. Co.*, 129 Neb. 855, 263 N. W. 393.

The record shows that the car of produce arrived in the railroad yards at Hartford on March 19, 1936. Trains running into Hartford bring in an average of 350 to 400 cars daily. The evidence is that at the time of the arrival of the car herein involved there were about 300 cars in the classification yard and approximately 900 cars in the flooded area. The classification of cars is accomplished by the use of a switch engine which pushes them over an incline or hump. The force of gravity propels them onto the different classification tracks. Road engines cannot be used for this work for the reason that they cannot negotiate the crossover tracks. At the time in question, one switch engine and crew were handling the work in the classification yard. The railroad yards here involved were about a mile from the Connecticut river and protected by dikes constructed to prevent flooding during high water seasons.

The evidence shows that flood data has been kept on the Connecticut river for approximately 300 years. The flood during March of 1936 exceeded all previous floods in the height to which it arose. The maximum height of this flood as determined by the United States weather bureau was 37.6 feet. The next highest flood was in May of 1854 when the river reached a height of 29.8 feet. The third highest flood occurred in November of 1927 when it reached a height of 29 feet. It will be observed that the 1936 flood was 7.8 feet higher than it had ever been in the recorded history of the Connecticut river. The evidence shows that the 1929 flood did not enter the classification yards at Hartford. The testimony of the men working in the classification yards is that the 1936 flood waters started coming in where they were working and that in a comparatively short time they were unable to work there because of the high water. The evidence shows that they had difficulty in removing their switch engine and three cars which they had to take out to clear the track. The records show that on March 19 at 8 a. m. the flood was at a height of 29 feet; at 6 p. m.

it reached 33 feet, and at midnight it had attained a height of 34.8 feet. At 8 a. m. on March 20, it had attained a height of 35.8 feet; at 6 p. m. it was 37.1 feet, and at midnight it was 37.4 feet. The flood reached its crest on March 21 at 8 a. m., when it reached a height of 37.6 feet. The protecting dikes built to withstand a flood of approximately 35 feet were topped on March 19. Without detailing the evidence unduly, we are convinced that the only logical conclusion which can be drawn is that the flood was of such an unprecedented and catastrophic nature that it falls within the legal definition of an act of God.

It has been correctly defined, we think, in the following language: " 'An act of God,' as the term is known to the law, is such an unusual and extraordinary manifestation of the forces of nature that it could not under normal conditions have been anticipated or expected." *Southern R. Co. v. Cohen Weenen & Co.*, 156 Va. 313, 157 S. E. 563. That the flood waters rose to such a height that the contents of the car were destroyed is not disputed. The question remaining for determination is whether the act of God was the immediate, direct and efficient cause of the loss, or whether the loss resulted from a failure of the railroad company to reasonably anticipate that damage would have been caused by the act of God.

"When damage is shown to have resulted from an immediate Act of God, such as a sudden and extraordinary flood, the carrier is exempt from liability unless the plaintiff proves that the defendant was guilty of some negligence in not providing for the safety of the goods. That he could do so must be proved by the plaintiff or must appear in the facts of the case." *Farr Co. v. Union P. R. Co.*, 106 Fed. (2d) 437; *Railroad Co. v. Reeves*, 10 Wall. 176, 19 L. Ed. 909. The test to be applied is not whether, in the light of subsequent events, the railroad company should have anticipated that the flood would cause damage to plaintiff's property, but whether the railroad acted as a reasonable and prudent man would have acted under all the circumstances existing at the time. *Standard Brands*

v. *Boston & M. R. R.*, 29 Fed. Supp. 593; *Louisville & N. R. Co. v. Finlay*, 237 Ala. 116, 185 So. 904.

The contention is advanced by the plaintiff that the railroad company was warned of the danger of the flood and that the failure of the railroad company to remove the goods to a place of safety constitutes actionable negligence. It is true that the United States weather bureau had issued many warnings concerning the progress of the flood and the implications to be drawn therefrom. On March 19, the date of the arrival of the car in question, the weather bureau bulletin issued at 10:30 a. m. indicated a leveling off of the flood with the crest at approximately 32 feet, a height below the point of danger to the classification yard. At 3:30 p. m. of the same day, a weather bureau bulletin was issued showing the height of the flood to be 32 feet and indicating a rise of five inches an hour for the next six to ten hours. It is quite evident from the record that, after the flood had once reached a leveling off stage, additional rains in the river's watershed added a huge volume of water to the already existing flood. But the rapidly increasing volume of water was reaching Hartford at the time the warning was released. The evidence shows that water started coming into the yards about 9:30 a. m. on March 19, and that approximately two feet of water came in within 30 minutes. It is evident that the 10:30 a. m. bulletin was too late to be of any value. The evidence is that the water carried in much trash and débris which made it very difficult to move the switch engine out of the flooded area. We fail to find any evidence that employees of the railroad company had any reason to suppose that the river would rise to a point almost 8 feet above any previous peak point in its history, until it was too late to act. Even if the flood exceeded all previous levels by three or four feet, it still would not enter the car in which plaintiff's produce was being transported. The number of cars in the yards and the amount of classification work to be done required that operations be continued as long as conditions appeared safe. At the first manifestation of immediate danger, engine

facilities were not available to move the cars out, and in any event it could not be reasonably contemplated that the flood would reach such a stage as to rise above the level of the box car floors. It is apparent that the railroad company and its employees acted on the belief that the contents of the cars in the classification yards were in no danger and there was much to justify this belief. The contention that the railroad was negligent in failing to anticipate the unprecedented rise of the river is to apply a standard of required action and diligence beyond that which the law implies. Assuming that the railroad company was negligent in not anticipating the danger, such negligence was not a contributing factor if there was no reasonable means available to avoid the consequences. The railroad company owed no greater duty to the plaintiff's shipment than it did to other shipments liable to be injured by contact with water. It is obvious from the record that, when danger to the contents of the cars was imminent, no means was available to avoid it. It is true that the cars might have been moved to higher tracks and the damage prevented. A subsequent view of the situation indicates that such a movement of the cars would have accomplished the desired results. But it did not appear necessary to do this at any time when it could have been done. The failure to move the cars to higher ground under such circumstances does not constitute negligence.

Plaintiff alleges that it was negligence for Walter L. Halliday, assistant superintendent of the New York, New Haven & Hartford Railroad, in charge of the railroad's properties at Hartford, to be away from his office during the night and early morning of March 19. The evidence shows that Halliday had been on duty for 58 consecutive hours because of the flood and that it was absolutely necessary that he obtain rest. On the other hand, it is not shown by the record that anything could have been done that could reasonably have been required if he had been in his office. The evidence on this subject is not sufficient to establish negligence on the part of the railroad company.

The record discloses that the flood was unprecedented and catastrophic in its nature. The high water levels of the river had never, in all of its previous recorded history, reached within approximately eight feet of the height of the 1936 flood. It was a disaster clearly and wholly attributable to causes beyond the control of human agencies. It clearly was an act of God which would exonerate the railroad company, unless the plaintiff has sustained the burden of proving that the negligence of the railroad company and its employees intervened to such an extent as to be the proximate and direct cause of the loss. After a full examination of the record, we agree with the trial court that the evidence of the plaintiff is insufficient to go to the jury on the question as to whether the railroad failed to exercise the care and diligence of reasonable persons similarly situated, in not anticipating the impending danger and resulting damage, in not taking measures to prevent the water damage to the produce, and as to whether such failures were the direct and proximate cause of the loss. *Standard Brands v. Boston & M. R. R.*, 29 Fed. Supp. 593.

A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The rule is well stated in *Farr Co. v. Union P. R. Co.*, 106 Fed. (2d) 437, as follows: "The rule is that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed."

It is the duty of a trial court to direct a verdict at the close of the evidence where the evidence is undisputed, or where evidence, though conflicting, is so conclusive that it is insufficient to sustain a verdict and judgment. We think the trial court was correct in directing a verdict for the defendant in this case.

AFFIRMED.