The judgment of the district court is affirmed.

AFFIRMED.

ED KRICHAU, APPELLANT, V. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLEE.

34 N. W. 2d 899

Filed December 10, 1948. No. 32429.

*Blackledge & Sidner,* for appellant.

*W. P. Loomis, Everett L. Randall,* and *J. W. Weingarten,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is an action at law to recover a money judgment for damage to plaintiff's land and crops which he claims was caused by the negligence of the defendant. At the conclusion of all of the evidence the defendant moved for a directed verdict. The trial court sustained the motion and dismissed the plaintiff's petition. Upon the over-

ruling of a motion for new trial, plaintiff perfected this appeal.

The case was tried and determined upon the sufficiency of the plaintiff's evidence to establish negligence on the part of the defendant as constituting the proximate cause of damage sustained by the plaintiff.

The plaintiff predicates error on the part of the trial court in sustaining the defendant's motion for a directed verdict, contending the evidence was sufficient to warrant the trial court in submitting the case to the jury.

For convenience, the appellant will be referred to as the plaintiff as originally designated, and the appellee as the defendant.

This jurisdiction is committed to the rule: "A motion for a directed verdict must, for the purpose of a decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and said party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the facts in evidence." Halliday v. Raymond, 147 Neb. 179, 22 N. W. 2d 614.

With the foregoing rule in mind, we review the evidence to determine whether or not the trial court erred, as contended for by the plaintiff.

The record shows that the plaintiff, for more than three years, has been the owner and in possession of the northeast quarter and that part of the southeast quarter lying north of the defendant's right-of-way, and that part of the west half of Section 7 lying north of the defendant's right-of-way, all in Section 7, Township 12 North, Range 14, in Buffalo County. The plaintiff has been familiar with the land in question for 30 years. The south boundary of the land is the defendant's railroad and the west boundary is Muddy Creek or Beaver Creek; both names refer to the same stream. Muddy Creek extends from its mouth, located about

three miles below Section 7, in a northwesterly direction about 60 miles to a point beyond Broken Bow, Nebraska, with several tributary streams.

At the southwest corner of the plaintiff's land there is a railroad bridge across Muddy Creek which, prior to June 21 or 22, 1947, consisted of a steel girder 75 feet in length spanning the channel of the stream. This bridge was supported by piers at each end with three concrete slab approach spans, each 16 feet in length, at each end of the girder, supported by concrete piling, giving an over-all length of 170 feet, with a clearance of 16 feet from the bottom of the girder to the surface of the water at low stage. This bridge runs in a northwest and southeast direction. The width of the channel immediately adjacent to the bridge is about 50 feet. The channel is 15 to 18 feet deep on both sides of the bridge and runs northeast under the bridge.

According to the plaintiff's testimony Muddy Creek runs on both sides of his land and follows a regularly defined course. The depth of the water in ordinary times is from two to two and a half feet. Muddy Creek flows under the railroad bridge in a northeasterly direction, and crosses the plaintiff's land in a northeasterly direction up to a point where a draw from the north enters such land; from there it flows southwest and a little to the west; then proceeds east and again northeast making what is called a horseshoe loop; then proceeds again to the railroad near the east line of the plaintiff's land and leaves his land. The 15 acres of land involved in this litigation is in the extreme southwest corner of the plaintiff's farm, and prior to June 21, 1947, was black sandy loam and under cultivation. It is located on the downstream side and northeast of the railroad bridge. About one mile west of this land is a sand deposit.

Half a mile west of plaintiff's land is a channel which is referred to as an "abandoned" channel, nearly a mile in length. In closing the abandoned channel, the culverts were left in. It appears from exhibit No. 18, which is

a map drawn to scale by a civil engineer, that the stream formerly flowed north across the location of the railroad, then east, then south, then southwest recrossing the railroad, and then west to the present channel.

In 1886, the defendant constructed its line of railroad from Ravenna west approximately 50 miles, in the valley of Muddy Creek on a right-of-way 100 feet in width in Section 7 heretofore referred to. Ravenna is in the immediate vicinity of the plaintiff's land.

The total drainage area of Muddy Creek from the headwaters to where it empties into the Loup River, is approximately 755 square miles. The creek meanders from north to south across the valley practically all the distance, and has a crooked, winding channel with the banks of the creek heavily overgrown with brush and trees. The valley varies in width from 1,000 feet in some places to three-quarters of a mile in others. The general direction downstream is from northwest to southeast. About 12 miles west of Section 7, Clear Creek, a tributary, enters into Muddy Creek from a northwesterly direction. The average width of the natural channel of the stream is approximately 70 feet, with an average depth of 18 feet.

In times of high water, the waters were naturally inclined to follow the old channel, or what has been referred to as the abandoned channel, and the drainage from the northwest, constituting a 1,400-acre drainage area, was inclined to stop or back-water on the north side of the defendant's right-of-way substantially in the same area as outlined by the original channel. This constituted a continuing threat against the defendant's right-of-way, the seepage and drainage being towards the right-of-way.

Following a heavy storm in 1924 resulting in a washout of the railroad by water draining into the abandoned channel, the defendant, in 1925, in order to provide additional drainage from the abandoned channel and the area tributary thereto lying to the west and north of

Section 7, acquired an additional strip of land 50 feet wide adjacent to the north side of its right-of-way across the northwest quarter of Section 7, and constructed a drainage ditch extending from the abandoned channel of Muddy Creek to the live channel of the stream immediately north of the railroad bridge designated No. 129-39 and heretofore described. This ditch is 2,100 feet in length from the western terminus on the west section line of Section 7 down to the west line of the creek, 30 feet in width at the top, 10 feet in width at the bottom thereof, and $7\frac{1}{2}$ feet deep, extending in a general easterly direction. This ditch was for the purpose of providing such drainage, and would carry a capacity of 150 square feet of water. The fall of the ditch from the west to its entry into Muddy Creek at the eastern end is 8 feet. The ground north of this ditch has a swale 900 to 1,000 feet in width which runs in a southeasterly direction parallel to the ditch and the track, the bottom of which is 400 or 500 feet north of the ditch about midway between the ditch from the old channel to the present channel of the creek. The land along this swale is 6 feet lower at the east end than at the west end. This swale is a flood channel which carried water to a depth of 3 feet at the time of the flood, June 21 and 22, 1947. The ditch was entirely submerged.

The defendant's track supervisor testified that rocks were placed at a location near the bridge to fill a hole that had washed out at the west end thereof, referred to as a cut-back, which was washed out prior to 1944. In 1944, and twice in 1945, seven and a half or eight car-loads of rock were dumped on the west bank near the bridge, and were hand-placed, with a few rocks at the foot of the watercourse which rolled into it. The fill at the end of the bridge extends down like the original banks of the creek, so that the dirt and the abutment at the end of the bridge extend to the water line. This rock is referred to as "riprap," and was imported by the defendant.

The plaintiff testified that the rocks were laid from the west end of the bridge across to the east side of the creek, with a bed of rock in the creek for the water to flow over; sloped gradually a distance of 40 feet; and that there were rocks in the stream itself which tended to throw the flow of the stream to the east and crowd the bank.

A witness for the plaintiff testified that 40 feet from the west end of the bridge there was a large pile of rocks on the south side of the railroad, practically as high as the railroad, the rocks tapering off toward the southeast across the channel, and the water was flowing over rocks; that when the bridge was first constructed there was 8 to 10 feet of clearance, and when the rocks were dumped in this caused a shutting-up of the space and permitted less water to go through when high water came; that it did not change the course of the stream much, but crowded it a little to the east, more so when there was high water. He further testified that in 1946 some trees, within a couple of feet of the east bank directly opposite the rocks, were cut out and a channel about 3 feet wide and 1 foot deep dug. This channel ran northeast and southwest about 3 feet from the edge of the water and about 6 inches above the bank, and was 10 or 12 feet in length. Prior to the placing of the riprap, the stream was washing out the bank at the west end of the bridge.

The plaintiff testified that on the night of June 21, 1947, there was a substantial amount of rainfall in this community and to the west. Plaintiff further testified that there was water on the land at flood stage and upon investigation a few days after the storm he found rocks and sand; and that the east bank of the stream at the southwest corner of the land was cut out and formed a hole at the east end of the railroad bridge possibly 150 feet square, as much on the north side as on the south side of the bridge. The land was covered with

sand and rock to a depth of from 6 inches at the east end to about 3 feet at the west end.

On June 21 and 22, 1947, there was a storm which produced floods generally, and on Muddy Creek produced a flood which inundated the valley between Litchfield and Ravenna with several feet of water from foothill to foothill. Between these points the normal channel of the stream was unable to carry the water. As a consequence, the valley between the hills on each side was flooded, washing away buildings, fences, railroad and highway bridges and embankments, and damaging property located in its path. Half a mile west of the plaintiff's land where the railroad crosses and cuts off the abandoned channel, part of the flood followed the course of this channel running over and washing the track off the embankment to the north at the west crossing, and to the south at the east crossing for about 1,000 feet at each place, and washing many holes of 30 feet or more in length in the 8-foot embankment on which the track was laid. At 6 a. m. June 22nd the flood arrived at a point 6 miles west of the plaintiff's land and had overflowed the defendant's track 3 feet deep. The valley at this point was flooded from foothill to foothill. At 9 a. m. the flood had reached a point 3 miles west of the plaintiff's land where the water was over the highway and track. At 3 p. m. the water was over the track 1,500 feet west of plaintiff's land and flowing down the track up to the ballast on both sides, and was up to the steel girder of the bridge. The plaintiff's land north of the track was under water. The railroad embankment, which consisted of sand, gravel, ballast, and some rock, was washed out and carried to the northeast.

The plaintiff and one of his witnesses testified that when there was more water than would flow in the channel of the creek, plaintiff's land was subject to overflow. The south half of his farm was overflowed; and the land on which the damage was claimed was flooded to a depth of from 4 to 8 feet. The water was 2 feet deep

in his barn which is approximately 1,800 feet from the railroad bridge. Plaintiff testified that as near as he could remember it was the highest water that he had ever seen in the vicinity. One of the plaintiff's witnesses who had been a resident of Ravenna for 52 years, testified that it was the highest water he had ever seen in the valley. This flood was the highest of any that the defendant had a record of since the construction of its railroad line in the Muddy Creek valley in 1886. It ranged 3 to 8 feet higher than any previous flood.

An engineer testified for the defendant as to the intensity of the storm, its course, and that it was statewide; that the channel of Muddy Creek, as shown by exhibit No. 18, is a winding, bending, turning, and tortuous channel; that when the water exceeds the capacity of the channel it goes out of its banks; and that where the channel turns and goes upstream in its direction, it comes in conflict with the water going down out of its banks which nullifies the efficiency of the channel, and that was true at the railroad bridge. At the railroad bridge the water was going in a northwesterly direction, the flood was proceeding from the other way, which made a piling up of the waters according to the flood levels, so it could not be said that the water was proceeding downstream; it had to go down and come back at the same time.

It is the plaintiff's contention that the defendant was negligent under the foregoing facts in the following particulars: That defendant caused the waters of Muddy Creek and the flood and surface waters to be diverted from their natural course and direction, obstructed the natural flow of the water in Muddy Creek, and caused the waters thereof to be thrown against and upon the land of the plaintiff; that the defendant caused and permitted the water in its drainage ditch to re-enter the natural channel at right angles and in such amounts and with such violence that the same washed away the natural bank of the stream and it overflowed on plaintiff's

land; and that the defendant failed to construct a retaining wall or other structure to withstand, control, and direct the flow of water so artificially diverted from the natural course.

The undisputed evidence discloses that the plaintiff's land was located in the direct flood channel of the stream, and the damage which he sustained was the result of an unprecedented flood. There is no evidence that either the riprap or the rock at the west end of the defendant's bridge, or the drainage ditch on defendant's land, or both of them combined, in any way caused or contributed to the damage of which the plaintiff complains.

From an examination of the record the following authorities are applicable:

In Goodhart v. Chicago, B. & Q. R. R. Co., 146 Neb. 290, 19 N. W. 2d 549, this court said: "In an action for damages to land and growing crops by floodwaters of a stream, subject to overflow from natural causes, and which it is alleged were thrown upon the plaintiff's land by the negligent and improper construction of a railroad near by and adjacent thereto, the burden of proof is on the plaintiff to show that the construction complained of either caused such overflow or increased the same, or in some manner contributed thereto, * * *."

"An act of God is such an unusual and extraordinary manifestation of the forces of nature that it could not under normal conditions have been reasonably anticipated or expected." Fairmont Creamery Co. v. Thompson, 139 Neb. 677, 298 N. W. 551.

"If the evidence essential to a recovery by plaintiff is clearly disproved by the physical facts and conditions, the trial court should direct a verdict against him." Hessler v. Bellamy, 128 Neb. 571, 259 N. W. 514.

"In every case, before the evidence is submitted to the jury, there is a preliminary question for the court to decide, when properly raised, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for

the party producing it, upon whom the burden of proof is imposed." Fairmont Creamery Co. v. Thompson, *supra.*

In view of the record and the afore-cited authorities, we conclude the trial court did not err in directing a verdict for the defendant.

AFFIRMED.