WALTER A. SNYDER, APPELLANT, v. FARMERS IRRIGATION DISTRICT, APPELLEE.

61 N. W. 2d 557

Filed December 18, 1953. No. 33342.

*Mothersead, Wright & Simmons,* for appellant.

*Neighbors & Danielson,* for appellee.

Heard before MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

A petition containing 10 comparable causes of action was filed by plaintiff Walter A. Snyder in his own behalf and as assignee of other named persons who all lived north of the railroad tracks in the westerly portion of Bayard, Nebraska. Plaintiff sought recovery of damages to both described personal and real property caused by an overflow of flood waters on August 25, 1950, alleged to have been proximately caused by negligence of defendant, Farmers Irrigation District. Generally, plaintiff alleged that defendant failed to properly maintain and operate its irrigation system, particularly an artificial drainage ditch known as Wild Horse Drain, in such manner as to carry a volume of water which would be reasonably anticipated to flow therein. Defendant for answer admitted that on said date the ditch overflowed its banks upon some of the described property. It otherwise denied generally and alleged that any damages suffered by plaintiff and his assignors were proximately caused by an act of God, that is, by an unprecedented rain storm of flood proportions which occurred above and north of defendant's main canal and suddenly without warning overflowed therein, causing a break in its lower bank, which, together with such rain as fell below its canal flowed into the drainage ditch here involved, causing it to overflow within the corporate

limits of Bayard. Defendant further alleged that plaintiff and his assignors were warned of the approaching great flood danger in ample time to have removed or protected their personal property, but they negligently failed to heed such warning and make any reasonable effort to do so, which proximately caused the damages thereto. Insofar as important here, plaintiff's reply admitted that on August 25, 1950, a break occurred in the lower bank of defendant's main canal, but otherwise denied generally.

Upon trial to a jury, the court overruled defendant's motion to direct or dismiss made at conclusion of plaintiff's evidence, which was renewed at conclusion of all the evidence, and also refused to give plaintiff's requested instruction No. 1, which in effect would have instructed the jury that defendant was proximately negligent as a matter of law, and the only issue for its determination was the amount of damages sustained by plaintiff. Thereafter the issues of negligence, act of God, and proximate cause, together with the respective burdens of proof with relation thereto, were submitted to the jury, whereupon it returned a verdict for defendant. Plaintiff's motion for new trial was overruled, and judgment was rendered on the verdict. Therefrom plaintiff appealed, assigning that the trial court erred prejudicially in refusing to give his requested instructions Nos. 1 and 3, and in giving instructions Nos. 3, 6, 7, 8, 9, 10, 11, and 18 on its own motion. We conclude that the assignments should not be sustained.

In that regard, the substance of plaintiff's requested instruction No. 3, refused by the trial court, was contained in and adequately presented by instructions Nos. 6, 7, and 8 given by the court on its own motion, so that its refusal does not require further particular discussion. In the final analysis the force of plaintiff's assignments was to contend that the trial court prejudicially erred in submitting any issue except the amount of plaintiff's damages, and in submitting to the jury defendant's al-

leged issue of warning contained in instruction No. 3 given by the trial court on its own motion.

As we view it, the latter contention is the more serious question and will be first discussed. Such instruction No. 3 was a resumé of defendant's answer, which sets forth not only defendant's general denial and its allegations that plaintiff's damages were proximately caused by an act of God, but also those relating to warnings given to plaintiff and his assignors, with regard to their personal property, as heretofore set forth. Plaintiff argued that the latter allegations therein set forth presented an issue not supported by any evidence, and that the submission thereof was prejudicial to plaintiff. We conclude otherwise.

In that regard, plaintiff relies upon Weisenmiller v. Nestor, 154 Neb. 839, 49 N. W. 2d 679, which is clearly distinguishable, and Conley v. Hays, 153 Neb. 733, 45 N. W. 2d 900, which held that: "It is error to set forth literally or substantially the pleadings in an action when to do so is to place before the jury issuable matters which find no support in the evidence." The situation in that case was comparable with the one at bar in some respects, but there as here it was finally concluded that the instruction, although erroneous, was not prejudicial requiring a new trial.

As held in Franks v. Jirdon, 146 Neb. 585, 20 N. W. 2d 597: "The proper method of presenting a case to the jury is a clear and concise statement by the court of those issues which find support in the evidence and not by substantially copying the pleadings of the parties and if, by doing the latter, it results in prejudice to the complaining party it is a sufficient ground for reversal." In that opinion, involving a comparable situation, it was said: "This court has frequently criticized the practice of copying the pleadings as a method of stating the issues to a jury and where they contain allegations not supported by evidence it may be reversible error to include such allegations in defining the issues if the reviewing

court is satisfied that the jury may have been misled thereby. See Hutchinson v. Western Bridge & Construction Co., 97 Neb. 439, 150 N. W. 193; McClelland v. Interstate Transit Lines, 139 Neb. 146, 296 N. W. 757. However, the fact that the court copied the pleadings in presenting the case to the jury is not alone sufficient to cause a reversal unless it can be said that the complaining party was prejudiced thereby. See Scott v. New England Mutual Life Insurance Co., 128 Neb. 867, 260 N. W. 377; Merritt v. Ash Grove Lime & Portland Cement Co., 136 Neb. 52, 285 N. W. 97. * * * The court instructed the jury that these instructions merely set forth the contentions of the parties and were not to be considered as evidence. The issues were subsequently limited and defined in other instructions. While it would have been better to have left out of instruction No. 2 the allegations discussed under the first and third phases of the criticized language, however, we do not think the jury could have been misled by the language used in view of the instructions as a whole and therefore come to the conclusion that it does not constitute prejudicial error." See, also, Shiers v. Cowgill, *ante* p. 265, 59 N. W. 2d 407.

In the case at bar, following a resumé of the pleadings, instruction No. 5 said: "The above instructions merely set forth the contentions of the parties in this case as disclosed by the pleadings filed and in no manner are to be considered by the jury as evidence in the case." The issue of warning, if legally operative to mitigate plaintiff's damages, could not have had any bearing in any event unless it was first found that defendant was negligent and not entitled to the defense of act of God. The issue was never again specifically mentioned or elaborated upon in any manner by any other instructions, and no requests were made therefor either by plaintiff or defendant, who ultimately obtained a verdict. Also, concededly, as alleged by defendant, ample timely warning of the magnitude of the flood was personally given to at least three of plaintiff's assignors, and the record

discloses that city police or firemen went to every home endangered and so warned all persons who were there. True, there is evidence that plaintiff himself was not at home at the time, although his wife and daughter were. It therefore appears that there was some competent evidence in the record to support such issue as against at least some of plaintiff's assignors. However, its operative legal force or effect as to them we are not required to discuss or decide.

That is true because in any event other instructions clearly defined and otherwise specifically and expressly limited the only issues presented for determination by the jury in a manner which could not have been prejudicial to plaintiff. In that connection, instruction No. 6 substantially told the jury that the burden was upon plaintiff to prove by a preponderance of the evidence: (1) That defendant in some manner negligently operated and maintained its irrigation works, particularly the ditch involved; (2) that plaintiff's damages were proximately caused by such negligence; and (3) the amount of plaintiff's damages, if any. The jury was then told that if plaintiff established each and all of such propositions by a preponderance of the evidence, it should find for plaintiff and against defendant for such amount as it found from the evidence plaintiff's damages to be, but that if the evidence upon any one or more of such propositions was evenly balanced or preponderated in favor of defendant, then plaintiff could not recover. The instruction then said: "The defendant contends that the *sole and proximate cause* of the damage to the plaintiff was occasioned by an Act of God, and in that connection the jury's attention is directed to Instructions No. 7 and No. 8 of these instructions." (Italics supplied.) Instruction No. 13 properly defined proximate cause. Instruction No. 7 read: "You are instructed that by the term, 'An Act of God', as the term is known to the law, is such an unusual and extraordinary manifestation of the forces of nature that it could not under normal conditions have

been anticipated or expected. For a loss occasioned by an 'Act of God', the defendant is not liable provided its own negligence has not contributed to the damage. Where the defendant relies upon an Act of God as a defense, the defendant assumes the burden of proof to the extent that it must prove by a preponderance of the evidence that the storm was of such a violent and unprecedented nature, that no ordinary or reasonable amount of care would have prevented the damage." Also, instruction No. 8 read: "If the plaintiff has established by a preponderance of the evidence that the defendant was guilty of negligence in the maintenance of the drainage ditch and that the plaintiff was damaged as a result of the flood waters coming down said ditch, then the burden of proof is upon the defendant to prove by a preponderance of the evidence, not only that the flood resulted from an Act of God, but also that the flood was of sufficient force to have caused the damage to the plaintiff without the occurrence of such negligence on the part of the defendant; in other words, that the damage would have resulted to the plaintiff even though the drainage ditch had been properly maintained."

Instructions Nos. 9, 10, and 11 simply elaborated in a proper manner upon defendant's liability not as an insurer but for negligence, and they will not be recited at length here. We conclude that under the aforesaid circumstances, instruction No. 3 was not prejudicially erroneous.

We turn then to a consideration of the sufficiency of the evidence to sustain submission of the issues of negligence, act of God, and proximate cause to the jury, and the propriety of instructions given with relation thereto. As late as Hilzer v. Farmers Irr. Dist., 156 Neb. 398, 56 N. W. 2d 457, following Fairmont Creamery Co. v. Thompson, 139 Neb. 677, 298 N. W. 551, as did Krichau v. Chicago, B. & Q. R. R. Co., 150 Neb. 498, 34 N. W. 2d 899, this court held: "An act of God is such an unusual and extraordinary manifestation of the forces of nature

that it could not under normal conditions have been reasonably anticipated or expected." Such definition was given in instruction No. 7, and plaintiff argued that the word "unprecedented" should have been used instead of "unusual and extraordinary."

In 1 C. J. S., Act of God, p. 1423, it is said: "The most comprehensive definition of the term is any accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected, could have been prevented." We approved that rule in Amend v. Lincoln & N. W. R. R. Co., 91 Neb. 1, 135 N. W. 235. As stated in Pollock on Torts (14th ed.), p. 393, quoted with approval in Jacoby v. Town of the City of Gillette, 62 Wyo. 487, 174 P. 2d 505, 169 A. L. R. 502, citing Nebraska cases: " 'And the act of God does not necessarily mean an operation of natural forces so violent and unexpected that no human foresight or skill could possibly have prevented its effects. It is enough that the accident should be such as human foresight could not be reasonably expected to anticipate; *and whether it comes within this description is a question of fact.'* (Italics supplied)."

We discover that while the term "act of God" has received a variety of definitions, they generally differ rather in the mode of expression than in their substance. Some cases have used the word "unprecedented" instead of "unusual and extraordinary" which we have accepted as more nearly correct. In that regard, as early as Kearney Canal & Water Supply Co. v. Akeyson, 45 Neb. 635, 63 N. W. 921, this court said: "The criticism on this instruction is the use of the word 'unprecedented.' It is said that this really means such a rainfall as was never known before,—a rainfall without precedent. We think the instruction would have been better had the court used the word 'extraordinary' or 'unusual' instead of 'unprecedented;' * * *." The judgment therein, however, was not reversed upon that ground because other

instructions used the word "unusual" as requested by defendant therein, so it was concluded that use of the word "unprecedented" was not prejudicially erroneous. Conversely here, instruction No. 7 in imposing the burden of proof upon defendant, used the word "unprecedented" so that plaintiff could not in any event have been prejudiced by the definition therein recited.

In City of McCook v. McAdams, 76 Neb. 1, 106 N. W. 988, with two other opinions upon rehearing thereof reported at pages 7 and 11, recovery was sought from the city for flood damage because it was alleged to have negligently maintained ditches or drains. The defense was a general denial and act of God. In the third opinion, this court held in part: "The jury were instructed in substance that, if they found that the defendant was guilty of negligence in failing to keep the drainage system in repair, the burden of proof was, in that event, upon the defendant to establish by a preponderance of the evidence that the storm was of sufficient violence to have caused the damage sustained by the plaintiff without the concurrence of such negligence. Held, That such instruction was not erroneous." In the opinion it was said: "While the burden is on the plaintiff to show that his loss is the result of the defendant's negligence, when he has established the facts of negligence on the part of the defendant and that his loss occurred directly therefrom, he has met all of the conditions the law imposes upon him in order to recover, before any evidence is produced by the defendant. He is not required to go further, and to anticipate and disprove all defenses which the other party may have pleaded or may introduce evidence to support under a general denial. When the plaintiff has closed his case, the defendant may show that it was not guilty of the negligent act complained of by either direct or indirect proof which negatives the proof offered by the plaintiff as to the fact of its negligence or the plaintiff's damage. Further than this, the defendant may plead and offer proof of matters in ex-

cuse or justification, as that the injury complained of would have occurred in any event without the concurrence of the defendant's negligence, or that some outside, independent force, of such nature that the defendant in its duty of observing care could not reasonably have anticipated or guarded against, was the proximate cause of the injury. Such defenses, while not technically confession and avoidance, partake of the nature of such defense. While not confessing the cause of action, they seek to avoid its effect by proof of other and new matter which bars the plaintiff's right to recover, and they must be established by the defendant in order to overcome the evidence on the part of the plaintiff, which, unexplained, would establish the defendant's negligence. They are affirmative in their nature and the burden of proving them is upon the person asserting them. * * * The burden was placed upon the plaintiff by the instruction to prove the defendant's negligence of duty and his damage. After he had made his case, in order to escape the logical result of this proof, the defendant was required to show that the loss was inevitable under the circumstances. We think this was proper. After its negligence was established it had the laboring oar. The burden did not rest upon it to disprove negligence, but upon the plaintiff to prove it, but, negligence being proved against it, it did have the burden of showing an independent cause for the injury, by reason of which it was released from liability." Instructions Nos. 6, 7, and 8 given by the trial court in the case at bar were comparable in every respect with those approved in that case, which was cited with approval in Randall v. City of Chadron, 112 Neb. 120, 198 N. W. 1020.

It has long been the rule that: "Where different minds may draw different inferences or conclusions from the facts proved, or if there is a conflict in the evidence, the matter at issue must be submitted to the jury to be determined; but, where the evidence is undisputed, and but one reasonable inference can be drawn from the

facts, the question is one of law for the court." Chew v. Coffin, 144 Neb. 170, 12 N. W. 2d 839. As held in James v. Hogan, 154 Neb. 306, 47 N. W. 2d 847: "It is not the province of this court in reviewing the record in an action at law to resolve conflicts in or weigh the evidence.

"It is presumed in such an action that controverted facts were decided by the jury in favor of the successful party, and its finding based on conflicting evidence will not be disturbed unless clearly wrong."

In the light of the foregoing rules, we have examined the record which is so voluminous that only a brief summary of relevant parts may be recited here.

Wild Horse Drain was constructed about 1918 or 1919 by the United States Reclamation Service pursuant to a contract between the United States, Alliance Irrigation District, City of Bayard, and defendant district. The parties thereby became tenants in common of the ditch. Each party obtained certain sections of the right-of-way, and paid a percentage of the cost of construction, operation, and maintenance. The extent and character of operation and maintenance was determined by a board consisting of a representative of each of the parties, but defendant assumed the duty of operation and maintenance subject to the direction of said board. Subsequently, Pathfinder Irrigation District succeeded to all rights and obligations of the United States. There are numerous maps, drawings, blueprints, graphs, and photographs in the record, but none of them reflect the original plans or specifications of the ditch. However, the record reflects that the purpose of its construction was for the drainage of waste and seepage water which passed through, under, and around the city of Bayard, situated within the drainage area, and to provide the city with appropriate wasteway conduits and sewer outlets. Sometime before its construction a so-called plow ditch about 1 foot deep and 3 feet wide had been constructed from a point some distance northwest of the city to a point where it approached the railroad south thereof, thence

east across to Main Street, north of the depot. In that situation and theretofore as well, water would often accumulate on lands west of Bayard and run across its sidewalks and main street as much as 1½ blocks or more wide, and too deep for ordinary pedestrian travel across it.

At a point 5 or 6 miles north of Bayard, East Wild Horse Drain goes under defendant's main irrigation canal and proceeds toward the south, thence southeast for some distance, thence southwest. West Wild Horse Drain passes under such canal about a mile west thereof, and runs toward the south for some distance, thence southeast. These two drains then converge at a point about 1 mile north of Bayard, thence proceed south and under the railroad tracks west of Bayard, thence east along the southerly portion of the city, and on into Red Willow Creek which empties into the North Platte River about 1 mile south thereof. There is competent evidence, although some conflicting therewith, that the drains generally followed the natural course of drainage. The banks of defendant's main irrigation canal were patrolled by ditch riders about 3 times each day. On August 25, 1950, a rain storm of cloudburst proportions, more than 3 inches, and as much as 5½ inches or more, greater than any theretofore seen in that territory, extending from about 10 miles north to south within about 3 miles of Bayard, fell in approximately 30 minutes. There was but little rain fell in the city itself. Presently a great wide and deep wall of water, carrying trees and other debris, including a 16-foot highway bridge, came down from the north into and across defendant's main canal, breaking the upper bank thereof and obstructing its flow. Thereupon the headgate was closed and water was wasted out of the canal at all wasteways, but nevertheless such wall of water went on over, breaking through the lower bank of the main canal into the East and West Wild Horse Drains, overflowing their banks in a wide, deep wall of water out into and over the

lands north of Bayard, and on over the railroad tracks for some 300 yards. As a result plaintiff's land and personal property to the north and west thereof was engulfed by the flood and damaged thereby.

At a point just above East Wild Horse Drain. the storm water crest was flowing at a rate of 13,569 cubic feet per second, and at a point just above West Wild Horse Drain, it was flowing at a rate of 2,117 cubic feet per second. Further, an automatic recorder showed that the crest of water at the point where Wild Horse Drain flows into Red Willow Creek, to which the flood did not extend, was less than 100 second feet at 5 p. m., but had reached 1,780 second feet at 11 p. m. The ditches had been inspected by the board shortly before the flood, but no recommendation for repairs or maintenance work had resulted therefrom, and none had been previously done for some period of time.

A civil engineer with many years of experience in the field of drainage and irrigation testified as an expert for plaintiff. During that period he had served as city engineer for Bayard several years before and after 1918. In October 1951, after the flood, he made a topographical survey of Wild Horse Drain. Prior thereto, some maintenance work had been done on the ditch after the flood to remove trees, a bridge, silt, and other debris, and repair its banks. At that time, in October 1951, the ditch, running bank full, would carry 1,800 second feet of water above the factory road, and 1,289 second feet below that point. There is evidence adduced by defendant that since the flood the capacity of the ditch had been increased not more than 10 percent. Plaintiff's expert witness testified in response to hypothetical questions that in his opinion the ditch had not been properly constructed as to slope, thereby permitting it to fill somewhat in the lower region, and that it had not been properly maintained thereafter prior to the flood. However, he gave as his opinion that over the area involved drainage should only be provided normally for a reason-

ably anticipated 2-inch rainfall in 1 hour over the entire area. In other words: "For that area two inches would be considered the normal rain to take care of—two inches in one hour over the entire area." Also, "that a drainage project should be constructed and maintained so it will carry off at least that much water." Such "a two-inch rain would put down 1470 second feet flow" which was in his opinion all "that ditch could be reasonably expected to carry." He also testified that if several thousand second feet came down, as could reasonably be concluded from the evidence, that would be more than anyone would anticipate that the ditch would ever have to carry, and that if that much came down you would expect the ditch to overflow and break out even though it was properly maintained in every respect.

There is evidence that previously some other small floods had occurred, and that on May 20, 1932, a rain of cloudburst proportions fell over an area in and north of Bayard about 4 miles or more, which caused a flood to spread out over a wider area of the city than the flood here involved. However, the witness who so testified saw the 1950 flood at the sugar factory road about 5 or 6 p. m., but did not thereafter see the crest thereof, which was not reached until about 8 or 9 p. m., or later.

There is no evidence of the volume of 1932 flood water in second feet except that such flood extended to Red Willow Creek, and the total discharge thereof at the North Platte River was only 1,320 second feet. Also, at the time of the 1932 flood, the ditch had only 5 by 8 foot easily obstructed cement culverts with which to carry the water under the roads at the sugar factory and main street. They were thereafter replaced by bridges 50 to 60 feet long. Further, the water flowed over the railroad tracks for about 1,000 feet in 1932 and washed out the tracks, but thereafter the railroad tracks were raised, and still the water flowed over them in the 1950 flood for about 900 feet, washing out its ballast. In other words, the area of the storm and the physical conditions were

not the same at the time of the two floods, and under the evidence here it could not be said without contradiction, as argued by plaintiff, that the 1932 flood was larger in volume than the 1950 flood. An engineer employed by the United States Reclamation Service testified as an expert for defendant that the water from the East and West Wild Horse drainage ways would have converged north of Bayard and flowed into the city, especially the western part, even in the absence of any ditches. In other words, without the drainage ditches, the waters from the last flood would have flooded the city and plaintiff's properties. There is other evidence in the record bearing upon the issues of defendant's alleged negligence and defendant's contention that an act of God was the sole and proximate cause of plaintiff's damages. However, as we view it, the evidence herein is either directly conflicting, or, if undisputed, more than one reasonable inference could be drawn therefrom.

There was competent evidence from which the jury could have reasonably concluded that defendant negligently maintained the ditch as argued by plaintiff, but as argued by defendant there was also ample competent evidence from which the jury could have reasonably concluded that even if defendant were negligent, it did not proximately cause or contribute in any manner to the flood and plaintiff's damages. In other words, there was ample competent evidence from which the jury could have reasonably concluded that the rain storm was so unusual and extraordinary in character and of such violence and volume as to have caused plaintiff's damages without any concurrent negligence of defendant, thus an act of God was the sole and proximate cause of plaintiff's damages.

We conclude that the verdict and judgment were sustained by competent evidence, and that there was no prejudicial error in the record. Therefore, the judgment should be and hereby is affirmed.

AFFIRMED.